The **BALTIMORE and OHIO RAILROAD COMPANY**, Canton Railroad Company, Western Maryland Railway Company, Baltimore Association of Commerce, the Baltimore Chamber of Commerce, the Steamship Trade Association of Baltimore, Inc., Baltimore Custom House Brokers and Forwarders Association, the Mayor and City Council of Baltimore, Plaintiffs, and Maryland Port Authority, Intervening Plaintiff,

v.

**UNITED STATES** of America, Interstate Commerce Commission, the New York Central Railroad Company, Erie Railroad Company, and the Pennsylvania Railroad Company and C. W. Boin, Agent, Defendants

and

Armco Steel Corporation, M. A. Hanna Company, Iron Ore Company of Canada, National Steel Corporation (Weirton Steel Company Division), Republic Steel Corporation, Wheeling Steel Corporation, the Youngstown Sheet and Tube Company, the Port of New York Authority, the Chamber of Commerce of Greater Philadelphia, the Delaware River Port Authority, the City of Philadelphia, Port of Boston Commission, the New York, New Haven and Hartford Railroad Company, and the Boston Maine Railroad Company, Intervening Defendants.

Civ. No. 9237.

United States District Court
D. Maryland.
April 26, 1957.

Edwin H. Burgess, Baltimore, Md. (William C. Purnell, Baltimore, Md. Jervis Langdon, Jr., Anthony P. Donadio, John S. Stanley, Charles J. Henry, Jr., Baltimore, Md., on brief), for plaintiffs.

Harry C. Ames, Washington, D. C. (Thomas N. Biddison, F. Clifford Hane, Baltimore, Md., attorneys for Mayor and City Council, on brief), for Baltimore Ass'n of Commerce and other Baltimore Commercial Interests, plaintiffs.

J. Crossan Cooper, Jr., Baltimore, Md. (Francis D. Murnaghan, Jr., Baltimore, Md., on brief), for Canton R. Co., plaintiff.

William L. Marbury, Baltimore, Md. (Donald Macleay, Washington, D. C., and Franklin G. Allen, Baltimore, Md., on brief), for Maryland Port Authority, plaintiff.

John H. D. Wigger, Attorney, Department of Justice, Washington, D. C. (Victor R. Hansen, Asst. Atty. Gen., Walter E. Black, Jr., U. S. Atty., Baltimore, Md., James E. Kilday, Attorney, Department of Justice, Robert W. Ginnane, General Counsel and I. K. Hay, Assistant General Counsel, Interstate Commerce Commission, Washington, D. C., on brief), for defendants.

John F. Donelan, Washington, D. C. (Dickson R. Loos, Washington, D. C., Wendell D. Allen, Baltimore, Md., on brief), for Armco Steel Corp., M. A. Hanna Co., Iron Ore Co. of Canada, National Steel Corp. (Weirton Steel Company Division), Republic Steel Corp., Wheeling Steel Corp., and the Youngstown Sheet & Tube Co., intervenors.

Henry E. Foley, Boston, Mass. (Herbert M. Brune, Jr., Baltimore, Md., and Clarence I. Peterson, Boston, Mass., on brief), for Port of Boston Commission, intervening defendant.

William Q. Keenan, New Haven, Conn. (Herbert M. Brune, Baltimore, Md., and Robert Bleakney, Jr., Boston, Mass., on brief), for New York, New Haven & Hartford R. Co. and for Boston & Maine R. Co., defendants.

Richard J. Murphy, Chicago, Ill., and Samuel H. Moerman, Washington, D. C. (M. C. Smith, Jr., Cleveland, Ohio, Robert D. Brooks, Sidney Goldstein, Francis A. Mulhern, New York City, Wilbur La Roe, Jr., Arthur L. Winn, Jr., J. Stanley Payne, Washington, D. C., Walter J. Myskowski, New Haven, Conn., Nicholas G. Penniman III, Baltimore, Md., on brief), for Erie R. Co., defendant, New York Cent. R. Co. and Port of New York Authority, intervening defendants.

Guernsey Orcutt, Philadelphia, Pa. (Richard R. Bongartz, Philadelphia, Pa., William Pepper Constable and George W. Constable, Baltimore, Md., on brief), for Pennsylvania R. Co. and C. W. Boin, Agent, defendants.

David E. Pinsky, Asst. City Sol., Philadelphia, Pa. (David Berger, City Sol., Philadelphia, Pa., on brief), for City of Philadelphia, intervening defendant.

George M. Radcliffe, Baltimore, Md., and Frederick H. Knight, Philadelphia, Pa., on brief for Chamber of Commerce of Greater Philadelphia, intervening defendant.

Warren Price, Jr., Washington, D. C. (George M. Radcliffe, Baltimore, Md., Morris Duane, Philadelphia, Pa., Bruce A. Wallace, Camden, N. J., on brief), for

Delaware River Port Authority, intervening defendant.

Before SOPER, Circuit Judge, CHESNUT and R. DORSEY WATKINS, District Judges.

SOPER, Circuit Judge.

This suit was brought by the Baltimore and Ohio Railroad Company, Western Maryland Railway Company, Canton Railroad Company and certain civic authorities and commercial organizations of Baltimore, Maryland, to set aside decisions and orders of the Interstate Commerce Commission which prescribed parity of railroad rates on imported iron ore from the ports of Baltimore, Philadelphia and New York to seventeen destinations in the eastern portion of the so-called differential or Central Freight Association territory. This area lies west of a line from Buffalo, New York to Pittsburgh, Pennsylvania and includes Youngstown, Ohio on the north, Wheeling, West Virginia on the south and other intervening steel producing points in western Pennsylvania, eastern Ohio and northern West Virginia.[1] The defendants, in addition to the United States and the Interstate Commerce Commission, include as original or intervening defendants the Pennsylvania Railroad Company which serves the port of Baltimore as well as the ports of Philadelphia and New York, the New York Central Railroad Company and the Erie Railroad Company which serve the port of New York, the Port of New York Authority, the New York, New Haven and Hartford Railroad Company and the Boston and Maine Railroad Company which serve the port of Boston, the Port of Boston Commission and divers producers and fabricators of steel in the differential territory.

The decisions of the Commission which are challenged in this proceeding mark the departure from a long established practice which has kept the rates applicable to both import and export traffic to and from differential territory lower as to Baltimore than the other Atlantic ports. The differentials were first established in 1877 by agreement of the carriers serving the territory in order to avoid misunderstandings in respect to the geographical advantages of Baltimore, Philadelphia and New York, as affected by rail-and-ocean transportation, so as to equalize the aggregate cost of transportation between competing points in the west and the domestic and foreign ports reached through those cities. The differentials were arbitrary in a measure since they reflected only in part the lesser distances to Baltimore and Philadelphia as compared with the distances to New York and Boston, but they were established by compromise as the only means of averting rate wars.[2] The differentials applied to all traffic eastbound and westbound, domestic and export-import, between Central territory and the north Atlantic ports. The differential on eastbound export traffic from the differential territory was 60 cents per ton less to Baltimore and 40 cents per ton less to Philadelphia than the corresponding rates to New York. On westbound import traffic the same differential applied to third or fourth class and special commodity rates. Rates to Boston were not to be less than those to New York on domestic or foreign freight. In 1880 an attempt was made to modify the agreement on the ground that changes had substantially equalized ocean freights but after arbitration by the Thurman Advisory Commission the differentials established in 1877 were reaffirmed.

While this arrangement originated in a voluntary agreement of the carriers it

---

1. Differential territory is defined in Baltimore Chamber of Commerce v. Ann Arbor R. Co., 159 I.C.C. 691, 692. The seventeen points, all consuming or storage centers for iron ore, are Midland, Farrell, Sharon and Sharpsville, Pa.; Martins Ferry, Mingo Jct., Steubenville, Lowellville, Niles, Struthers, Warren, and Youngstown, Ohio; Benwood, E. Steubenville, Follansbee, Weirton and Wheeling, W. Va.

2. See Maritime Ass'n, Boston Chamber of Commerce v. A. A. R. R. Co., 95 I.C.C. 539, 567; 126 I.C.C. 199.

has been considered by the Commission from time to time during the past 60 years when it was brought to the Commission's attention by commercial interests in Boston, New York, Philadelphia and Baltimore, and in each instance has been found lawful.[3]

Prior to 1930 the differential was applicable to both domestic and import-export traffic. In that year the Commission removed all domestic class rates from the scope of the differential rate structure and prescribed new scales of class rates from the several ports, based primarily on distance.[4] Under this new arrangement the longer distances from the three other ports resulted in a differential on domestic traffic to and from Baltimore, which exceeded the long established differential in its favor on import and export traffic. The domestic first-class rates to Youngstown from Baltimore were fixed at $2.01 per hundred pounds, from Philadelphia $2.16 per hundred pounds, from New York $2.31 per hundred pounds, and from Boston $2.70 per hundred pounds. Since these rates did not cover import and export traffic the railroads in 1932 published new import and export class rates. These were made the same as the new domestic rates so far as Baltimore was concerned and the standard differentials in favor of Baltimore of 20 cents a ton with respect to Philadelphia and 60 cents a ton with respect to New York and Boston were preserved. The import-export class rates from the three cities last mentioned thus became generally lower than their domestic rates.

For some reason, that is not explained, the rates on iron ore from Philadelphia to Pittsburgh have been the same as those from Baltimore to Pittsburgh since 1903. This parity, however, prior to the present controversy, has been only a paper equalization since there has been practically no movement from Philadelphia to Pittsburgh and no attempt has been made by the Baltimore railroads to set up a differential on this traffic.[5]

In 1949, in response to complaints from steel producers in the interior calling attention to the increased volume of movement and other changed conditions, the carriers undertook a study of the rate structure and as a result the Baltimore and Ohio, the Western Maryland, the Pennsylvania and connecting lines established, as of October 9, 1950, reduced rates on iron ore from Baltimore to Pittsburgh and also to steel mills in differential territory to the west. The Pennsylvania made a like reduction on iron ore from Philadelphia to Johnstown and Pittsburgh. The new rates retained the regular port differential to destinations in differential territory and parity between Baltimore and Philadelphia on traffic moving to Johnstown and Pittsburgh. No action was taken at this time to establish revised rates on iron ore

3. For a résumé of the history of the differential, see In the Matter of Differential Rates, 11 I.C.C. 13 (1905); Albany Port District Comm. v. Ahnapee & W. Ry. Co., 219 I.C.C. 151 (1936). It was also considered under varying circumstances in New York Produce Exchange v. Baltimore & O. R. Co., 7 I.C.C. 612 (1898); In the Matter of Relative Rates upon Export and Domestic Traffic in Grain and Grain Products, 8 I.C.C. 214 (1899),; Chamber of Commerce of N. Y. v. N. Y. C. & H. R. R. R. Co., 214 I.C.C 155 (1912); In the Matter of Import Rates, 24 I.C.C. 78 (1912); Baltimore Chamber of Commerce v. Ann Arbor R. Co., 159 I.C.C. 691 (1929); Lighterage Cases, 203 I.C.C. 481 (1934); City of Philadelphia v. Baltimore & O. R. Co., 231 I.C.C. 21 (1938); State of New Jersey v. Baltimore & O. R. Co., 24 I.C.C. 581 (1941); Port of New York Authority v. Baltimore & O. R. Co., 248 I.C.C. 165 (1941); Ex Parte Grain from Buffalo to N. Y., 278 I. C. C. 31 (1950).

4. Eastern Case Rates Investigation, 164 I.C.C. 314.

5. In the seven years from 1946 to 1952, inclusive, 2,160,000 gross tons moved from Baltimore to the steel mills in Pittsburgh, and 652,500 tons from Baltimore to Johnstown. No tonnage moved from Philadelphia to Pittsburgh and only 8,333 tons, comprising one cargo, to Johnstown. During the six years from 1946 to 1953 inclusive, approximately 647,000 tons moved from Baltimore to the steel mills in the Youngstown area and none from Philadelphia.

moving from ports other than Baltimore to differential territory, but the record of the conference of railroads shows that "it was understood the usual port differentials should be observed from the other north Atlantic ports."

In August 1951, the Pennsylvania, anticipating an increase in the volume of imported iron ore and conscious that it could not expect to share in the transportation of the commodity from Philadelphia to the interior without adequate unloading facilities at this port, announced that it would erect a modern unloading facility at Greenwich in South Philadelphia designed to cost not less than $10,000,000. It proceeded to erect such facility and had spent the greater part of this sum before publishing reduced rates on iron ore, effective February 9, 1953, to which reference will now be made. Unloading facilities were installed in Baltimore by the Canton Railroad in 1917.

It was against this background that the Interstate Commerce Commission, in the decisions now under review, gave its approval to parity of rates on iron ore moving from New York, Philadelphia and Baltimore to Central territory, but denied parity to Boston. The case grew out of the publication by the Pennsylvania of reduced rates on iron ore, effective February 9, 1953, from Philadelphia to the seventeen points in differential territory, and the simultaneous publication of like rates by the New York Central from the ports of New York and Boston, and by the Erie Railroad from New York to destinations in the Youngstown area on their lines. The effect of these publications was to reduce the rates on iron ore from Philadelphia, New York and Boston to Youngstown to $2.71 per gross ton, the same rate which applied to Baltimore.[6] In order to meet this reduction and to preserve at least in part the historic differential, the Baltimore and Ohio and the Western Maryland then published, to be effective February 16, 1953, a reduced rate of $2.51 per ton on iron ore from Baltimore to those of the sev-

enteen points on their lines, thus restoring a 20-cent differential in favor of Baltimore as compared with the other three ports. No attempt was made by the Baltimore railroads to restore the standard differential of 60 cents over New York and Boston.

The Baltimore and Ohio and the Western Maryland also published a reduction of 20 cents per ton, effective February, 16, 1953, to Pittsburgh, Johnstown, Donora and Monessen in order to establish a differential on shipments of ore to Pittsburgh in accordance with the general port differential structure and to preserve a proper rate relationship between Pittsburgh and the other named cities. The Pennsylvania countered with a rate reduction of 20 cents per ton, effective February 16, 1953, from Philadelphia and Baltimore to the four named cities, and a further reduction of 20 cents in its rates from Philadelphia and Baltimore to the seventeen points in differential territory, effective March 11, 1953.

The Baltimore and Ohio, the Western Maryland and divers Baltimore interests protested the rate reductions by the other railroads and all of the above-mentioned reductions were suspended by the Commission pending an investigation instituted on February 6, 1953. This was followed by a hearing and oral argument, and an order of Division 2 of the Commission on February 5, 1954, which approved the reduction originally published by the Pennsylvania, effective February 9, 1953, giving Philadelphia a parity with Baltimore, but cancelled the tariffs of the New York Central and the Erie equalizing rates from New York and Boston with Baltimore. Division 2 also found that the February 16, 1953 tariffs of the Baltimore and Ohio and the Western Maryland, and the March 11, 1953 tariffs of the Pennsylvania were not just and reasonable and ordered them to be cancelled. The Pennsylvania then published a supplementary tariff making the equalization of rates effective February 19, 1954, whereupon the Baltimore

6. The rates are stated without the general increase approved in Ex-Parte No. 175.

interests filed suit in this court asking a restraining order pending reconsideration by the entire Commission. The court refused to issue the order on the ground that the administrative process had not been completed, with the result that parity rates from Philadelphia went into effect and have since prevailed. The full Commission, on July 30, 1954, stayed its order cancelling the rates from Baltimore, New York and Boston and reopened the proceeding. Finally, on October 1, 1956, the Commission rendered its decision, finding that the February 9, 1953 rates from Philadelphia and New York were justified but that the February 16, 1950 rates from Baltimore, the March 11, 1950 rates from Philadelphia, and the February 9, 1953 rates from Boston were not justified and ordered them cancelled. In this proceeding we are concerned with the propriety of the Commission's action as to the rates from Baltimore, Philadelphia and New York.[7]

The modification of rates on iron ore by the railroads which serve the Atlantic ports in competition with Baltimore was brought about by important changes in business conditions involving an increased demand for steel and an increase in the importations of iron ore which theretofore had contributed little to the total volume of commodities transported by the railroads from the coast to the interior. The origins of the ore that has been and will be imported through the Atlantic ports have an important bearing on the controversy. No figures are available for the years 1955, 1956 or 1957 since the record before the Commission was closed on December 21, 1954, and the case is submitted to this court on the Commission's record. An outline of the conditions prevailing prior to and after World War II and until the Commission's record was closed is set out in the following excerpt from the report of Division 2 of the Commission:

"Mines in northern Minnesota, Wisconsin, and upper Michigan have for many years been the sole or principal source of supply for the iron-ore requirements of steel mills in central and trunkline territories, the preponderance of the ore moving by rail to Lake Superior docks, thence by water to lower Lake Erie ports, and by rail beyond. Prior to the end of World War II in 1945, importation of iron ore was comparatively light and the preponderance of the ore imported was consumed in furnaces at or near the eastern seaboard. Some imported ore moved to steel mills in the Johnstown and Pittsburgh, Pa., areas but little, if any, moved to mills west thereof. A few shipments which moved to interior points were consigned to manufacturers of paint or other commodities not produced by the steel mills.

"Since the end of World War II, steel producers have developed sources of supply for iron ore in Venezuela, Chile, Liberia, Brazil, Sweden, and Cuba, and this basic raw material of the steel industry has been imported in large volume. Mines now being developed in Labrador by the Iron Ore Company of Canada will supply large quantities of iron ore for the furnaces of five steel mills in central territory which own stock in that corporation, and to other consumers. During the 6-year period from 1936 through 1941 from approximately 2,000,000 to 2,500,000 tons of iron ore were imported annually. The import movement declined drastically during World War II, reaching a minimum of 402,096 tons in 1943, most of which originated in Canada. Following the war, importation of iron ore increased from 1,189,300 tons in 1945 to 10,145,415 tons in 1951, the latter figure equivalent to over 4 times the prewar tonnage. In 1952, a strike occurred in the steel industry and approximately 9,760,300 tons of iron ore were imported during that year.

---

7. By a subsequent decision filed on March 19, 1957, the Commission reaffirmed its decision as to the Boston rate.

It is estimated that within a few years 20,000,000 tons of iron ore will be imported annually, a substantial portion of which will move to furnaces in central territory. While ex-lake ore will continue to move from the Lake Erie ports in large volume, it will be replaced by imported ore to a greater extent than in the past."

The full Commission, in its report of October 1, 1956, commented upon the increase in importations of iron ore into the United States in the following excerpt from its decision:

"Iron ore imported into the United States in 1948 originated in 28 foreign countries and aggregated 6,-091,677 gross tons. By 1953 the tonnage had increased to 11,074,035 gross tons. The principal exporting countries in this period were Chile, Sweden, Venezuela, Brazil, Liberia, and Peru. On and between August 26 and October 6, 1954, a total of 1,511,875 gross tons of ore were shipped from 13 foreign ports to north Atlantic ports. Of this amount, 776,851 tons (51 percent) entered the Port of Baltimore, 718,-809 tons (48 percent) entered the Port of Philadelphia, and 16,215 tons (1 percent) entered the Port of Boston. There was no reported entry of ore at New York during this period. Approximately one-third of this ore originated at Seven Islands, Labrador, from which no tonnage moved prior to 1954."

Statistics furnished to the Commission show that during the years 1952, 1953 and eight months of 1954, 94% of all the ore imported through the north Atlantic ports came from Venezuela, Chile, Sweden, Peru, Brazil and Liberia, amounting to 7,229,903 tons in 1952; 8,065,922 tons in 1953 and 6,746,335 tons in 1954. Bethlehem Steel Corporation and United States Steel Corporation consumed most of the imports. Thus, in the eight months of 1954 the aggregate imports of these two corporations amounted to 77% of the total. Imports to these corporations are not delivered to the railroads but are consigned to their own facilities: at Sparrows Point for the Bethlehem Steel Corporation and Fairless (Morrisville, Pa.) for the United States Steel Corporation. The facilities at Sparrows Point have a capacity of 6,000,000 tons and those at Fairless have a capacity of 2,000,000 tons annually. None of the ore delivered to Sparrows Point moves to differential territory. We are concerned primarily with the importations of iron ore that are delivered to the railroads for transportation to interior points subject to the published rates.

Looking into the future, the most striking factor to be considered is the assured prospect that importations of iron ore from Labrador will dominate the situation. From July 31, 1954, when these shipments began, to December of that year, 1,375,747 tons were unloaded at Baltimore and Philadelphia; and it seems certain that this was merely a beginning, for, as the Commission said in its final report, the evidence leaves no doubt that "Labrador tonnage will increase to 10,000,000 tons in 1956 and probably to a greater extent in later years." In short, importations from Labrador may be expected to constitute at least one-half of all the ore imported. The proportion of this business which will come to Baltimore and Philadelphia, respectively, is foreshadowed, although imperfectly, by what happened in the last six months of 1954. In that period 744,017 tons came to Baltimore and 631,-730 tons to Philadelphia. The Philadelphia tonnage would have been greater and the Baltimore tonnage less by 113,-210 tons but for a strike which caused a diversion to Baltimore of tonnage consigned to Philadelphia.

The effect of the abolition of the differential between Philadelphia and Baltimore, which became effective on February 19, 1954, is shown to some extent by comparison of deliveries of foreign ore from all sources to railroad piers at the two ports in 1953 and 1954. In the first year Baltimore received 1,813,512 tons of which 808,875 were delivered to the railroads for shipment to the differ-

ential territory, while Philadelphia received 1,113,917 tons of which 687,994 tons were delivered to the railroads to be delivered, 20,561 tons to Pittsburgh and 667,433 tons to points east of Pittsburgh—none of it going to the differential territory. In 1954, Baltimore received 1,644,294 tons and of this 1,070,457 tons went to destinations west of Pittsburgh; while in this year Philadelphia received 1,564,844 tons of which 681,599 tons went to the differential territory.

The future movement of foreign ore to this country, especially ore from Labrador, is the all-important circumstance in this case. The Labrador deposits are owned by the Iron Ore Company of Canada, of which 27% is owned by the M. A. Hanna Coal and Ore Company and the balance by five steel producers [8] owning plants west of Pittsburgh, including twelve or thirteen plants in differential territory. These corporations are entitled to share in the product in proportion to their interests. The steel producers in differential territory will use their shares and the balance will be sold, for the most part, to the Bethlehem Steel Corporation. All of the ore is shipped from Seven Islands, Labrador. While some of it will move by routes not involved in this proceeding, five or six million tons will move annually through Atlantic ports to inland furnaces. The ore will be carried in ships owned or chartered by the Iron Ore Company of Canada or the participating companies; and the record shows that, in order to save transportation costs by sea, the ore will be delivered, in case of parity of railroad rates, to the nearest port equipped with efficient unloading facilities. The Commission found that the one-way ocean distances from Seven Islands to the four Atlantic Coasts to be: Boston, 950 miles; New York, 1,187 miles; Philadelphia, 1,320 miles, and Baltimore, 1,475 miles. If the Chesapeake and Delaware Canal were used the excess distance to Baltimore over Philadelphia would be 26 miles, but the Commission found that the larger ore vessels cannot use the canal at present and probably would not use it if the canal were deepened. The evidence shows that a 20,000 ton ore carrier with a speed of 14 knots requires three days less steaming time on a round trip basis from Seven Islands to Boston, two days less to New York and twenty-one hours less to Philadelphia than to Baltimore; and that it costs $2,000 per day to operate such a ship. Abolition of the differential of 20 cents per ton in favor of Baltimore and the establishment of parity of railroad rates between Philadelphia and Baltimore would cause shippers to route Labrador ore destined for differential territory through the Port of Philadelphia.

Since the Commission's decision of October 1, 1956, took no account of any shipments subsequent to December 1954, the effect of the parity of rates between Philadelphia and Baltimore in the intervening period was not ascertained, although it might have been done before the decision was rendered. The record, however, throws some light, as we have seen, on the shipments in the limited period between February 19, 1954, when the Pennsylvania put the parity rates into effect, and December 1954. The evidence directed to this period, although necessarily meager, tends to confirm the opinion of experienced witnesses heard by the Commission, that under parity rates Labrador ore destined for differential territory will move through Philadelphia and not through Baltimore. The experience of the Canton Railroad emphasizes this conclusion. This is a shipping road with 37 miles of track in the Port of Baltimore, connecting with the Baltimore and Ohio and the Pennsylvania by rail and the Western Maryland by float. It constructed the first unloading facilities in Baltimore in 1917, in which it has invested $5,000,000 in reliance upon the differential. It is

---

8. National Steel Co., Republic Steel Corp., Armco Steel Corp., Youngstown Sheet and Tube Co., Wheeling Steel Corp.

largely dependent upon the importations of ore. In 1952, its tonnage of imported ore comprised 55% of its total of which 39% was iron ore; and in 1953, the corresponding percentages were 66% and 28%, respectively. In the first nine months of 1953, it received 499,000 tons of iron ore but in the same period in 1954 under parity this amount had diminished to 239,000 tons, a decrease of 52%.

A similar situation exists with regard to the much smaller amount of ore which is brought to this country from the Port of Monrovia in Liberia. This ore is controlled by the Republic Steel Corporation, which has furnaces in differential territory and carries the ore in its own ships. In 1952, 420,000 tons were imported and it was estimated that in 1953 the amount would be somewhat larger. Heretofore all or nearly all of this ore was delivered at the Port of Baltimore. The ocean distances (miles) from Liberia to the Atlantic ports are as follows: Boston, 3,920; New York, 3,973; Philadelphia, 4,074, and Baltimore, 4,194.

The iron ore brought in from South America and Scandinavia has little bearing on the question at issue. The Commission found that, in the first nine months of 1954, 94% of the ore which originated in Venezuela, Chile, Peru and Sweden was consigned to the United States Steel Corporation and the Bethlehem Steel Corporation. Bethlehem received about 6,000,000 tons, none of which moves to differential territory. It is estimated that United States Steel will receive about 7,000,000 tons annually, of which 2,000,000 tons will enter the United States through the Gulf ports and 2,000,000 tons more will be consumed at Fairless. There will be a substantial movement from the docks owned by the corporation at Fairless by rail to Pittsburgh. Facilities at Fairless permit the blending of the iron before shipment to Pittsburgh and this service will be improved, and when this is done the United States Steel Corporation will abandon its practice of importing through Baltimore the iron ore for use at Pittsburgh. The corporation is not interested in the rate from Baltimore but desires a lower rate from Fairless to Pittsburgh. Baltimore has an advantage as to distances over the other ports with respect to shipments of ore from South America, except Brazil, but a disadvantage with respect to the shipments from Scandinavia.

Adequate unloading facilities are essential to the delivery of iron ore at a point of entry. Canton Railroad, as we have seen, was the first to establish such a facility in Baltimore in 1917. The Western Maryland followed in 1930, and its facility with subsequent improvements can now handle three ships at a time. The Baltimore and Ohio pier was built in 1950 and 1951 and cost $5,000,000. The capacity of these three piers in Baltimore is 13,500,000 tons per year, based on a 15% use of specially designed ore carrier type ships, and if the use of such ships is raised to 65% the total capacity will be increased to 22,275,000 tons per year. These facilities were constructed while the differential was in effect.

In March 1954, the Pennsylvania completed the first stage of its unloading facility at a cost of $11,000,000. The capacity is from 3,000,000 to 6,000,000 tons of ore, depending on the type of ship. An enlargement, which would have increased the capacity of the facility by 50%, was ordered in 1954 and scheduled to be finished in 1955. The Pennsylvania contemplates an ultimate expansion which would enable it to treble its original capacity. It estimated that it needed 2,500,000 additional tons of ore per year to maintain its Philadelphia pier profitably. These facilities were established while there was parity of rates between Baltimore and Philadelphia on traffic moving to Pittsburgh.

Bethlehem at Sparrows Point and the United States Steel at Fairless each has its own unloading facility. The first has been in operation since 1946 and the latter since January 1953.

New York and Boston have no modern ore unloading facilities and only a very small tonnage of iron ore passes through these ports. Without parity of rates with Philadelphia and Baltimore no facility is planned at either location.

The relation of the rates to the distances for which iron ore is transported from the Atlantic ports to the differential territory is a factor necessary to be considered in this case since § 3 of the statute forbids a carrier to give any undue or unreasonable preference to any port or locality, or to subject any port or locality to any undue or unreasonable prejudice. The short line distances of the railroads from the several ports to Youngstown, Ohio, that is, the shortest physical routes over which traffic may be moved without transfer of lading, although through rates and routes may not be published, are as follows:

### To Youngstown, Ohio

| From | Short Line Distance miles | Difference in Distance over Baltimore miles |
|---|---|---|
| Baltimore .............. | 378 | — |
| Philadelphia ............ | 424 | 46 |
| Morrisville ............. | 437 | 59 |
| New York .............. | 490 | 112 |
| Boston ............... | 646 | 268 |

The short tariff route distances between these points, that is to say, the shortest routes from each port over which rates on iron ore are actually published, are as follows:

### To Youngstown, Ohio

| From | Short Tariff Route miles | Excess over the Shortest Tariff Route from Baltimore (W. Md.— 381 Miles) |
|---|---|---|
| Philadelphia: | | |
| P.R.R. .............. | 428 | 47 |
| Morrisville: | | |
| P.R.R. .............. | 441 | 60 |
| New York: | | |
| Erie ............... | 569 | 188 |
| N.Y.C. .............. | 612 | 231 |
| Boston: | | |
| N.Y.C. .............. | 670 | 289 |
| B & M ............... | 661 | 280 |
| NY., NH., & H. ....... | 692 | 311 |

For reasons of convenience, the Pennsylvania moves iron ore traffic over longer and more circuitous routes from both Philadelphia and Baltimore to Youngstown. The route which it uses from Philadelphia (434 miles) is practically the same as its short tariff route therefrom (428 miles); but instead of

using its short tariff route of 404 miles from Baltimore, it carries the shipments 423 miles through Perryville, Maryland. If its actual operating route from Philadelphia is compared with its actual operating route from Baltimore, the difference in distance is only 11 miles; but if this operating route from Philadelphia is compared with the short operating route from Baltimore—that of the Western Maryland Railroad—Philadelphia's excess distance is 53 miles.

The decisions of the Commission are set forth in the report of Division 2 on February 5, 1954, 291 I.C.C. 527, and the report of the full Commission on October 1, 1956, 299 I.C.C. 195. The latter dealt principally with additional evidence adduced in the interval and seems to have adopted the report of Division 2 except that it approved the new schedules from New York to the Youngstown area which Division 2 had rejected. The reports recite in considerable detail the history of the differential, hereinbefore set out, and the contentions of the opposing sides [9]; and the findings of the Commission, which are sometimes mingled with the statement of the contentions of the parties, and the ultimate conclusions of the Commission are then set forth. They may be summarized as follows:

It is shown by a statement filed by the Pennsylvania in support of its claim to parity, which the Commission seems to have found correct, that parity of rates on iron ore applies both from Baltimore and Philadelphia to Steeltown, Pennsylvania, a steel producing point east of Pittsburgh; also from Baltimore and Philadelphia to Buffalo, although the route from Baltimore over the Baltimore and Ohio is 190 miles and that over the Western Maryland is 165 miles longer than the route from Philadelphia over the Pennsylvania. A similar comparison is made between routes from Baltimore and routes from Norfolk to steel mills in Ohio and Michigan as to which parity prevails, although the distances from Norfolk are from 25 to 192 miles longer than the distances from Baltimore. Likewise parity of rates but disparity of distances exist in rates from Lake Erie ports to steel mills in the Youngstown and Wheeling areas, as to which reference is made to the decision of the Commission in Iron Ore Rate Cases, 41 I.C.C. 181, in which the Commission pointed out that blast furnaces must be operated continuously and that it is of advantage to the steel producers and also to the operators of the vessels to have more than one port available. It was also shown that there is a movement of large quantities of eastbound ore from Erie and Buffalo to the steel mills at Bethlehem, Fairless, Philadelphia and Sparrows Point under a parity rate of $2.71—

9. The Commission notes the contentions of the Pennsylvania that parity between Baltimore and Philadelphia is necessary so as not to stifle the importation of iron ore through Philadelphia and so as to enable the steel producers to make proper use of the new facilities at Philadelphia; that the differential was never intended to apply to low-grade bulk material and hence parity did not constitute a departure from the former practice; that Baltimore did not object to parity with Philadelphia on traffic moving to the Pittsburgh area for 50 years and that all imported iron ore moves through Pittsburgh; that the commercial interests of Baltimore will not be injured since parity as far as the Pittsburgh area has not disrupted the general port differential adjustment and the great increase in imports of iron ore will provide ample tonnage for Baltimore's un-loading facilities. On the other hand, the Commission takes cognizance of the contentions that interests serving the port of Baltimore are entitled to reap the natural advantages flowing from its location; that parity would deprive Baltimore of these advantages and place the entire port differential rate structure in jeopardy by giving rise to demands for reduced rates on other imported bulk commodities; that the earnings on tonnage carried from Baltimore was substantially greater than on tonnage carried from Philadelphia to the differential territory because of the shorter distances from the former port; that parity of rates on iron ore from Baltimore and Philadelphia to Pittsburgh during the past 50 years should be disregarded because there was no movement from Philadelphia to Pittsburgh under this schedule.

notwithstanding the inequality of distances; and it was said that the earnings under the proposed rates from Philadelphia to steel mills in the Youngstown area compare favorably with the earnings under the $2.71 rate from Erie and Buffalo to eastern furnaces.

In both reports the Commission seems to have approved the contention of the Pennsylvania that there are only 11 miles difference between the transporation routes from Philadelphia and Baltimore to the differential territory and, therefore, the services from both ports are substantially identical. In its final report the Commission said:

"The Pennsylvania urges also that rates from Philadelphia the same as those from Baltimore are justified by mileage and service factors. The average tariff-route ·distances over the Pennsylvania to the 17 destinations in differential territory are 422 miles from Philadelphia and 398 miles from Baltimore. Based on these distances, the equalized rates yield average ton-mile revenues of 6.4 mills from Philadelphia and 6.7 mills from Baltimore. The actual operating route of the Pennsylvania from Philadelphia is only 11 miles greater than its actual operating route from Baltimore. In both instances, the movement is via Pittsburgh, and approximately 75 percent of either haul is over the same tracks. Thus, the service over the Pennsylvania is substantially identical from both Philadelphia and Baltimore."

This statement seems to say that, in considering difference of distance between Baltimore and Philadelphia, the comparison should be made between the Pennsylvania's direct route from Philadelphia and its unnecessarily long route from Baltimore via Perryville, rather than between the tariff route of the Pennsylvania from Baltimore and the corresponding routes of the Baltimore railroads from Baltimore.

Division 2 of the Commission had little to say about the movement of the Labrador deposits because they had not begun to move prior to February 5, 1954, when the report was filed. The Commission merely quoted an owner of stock in the Iron Ore Company of Canada as saying that five or six million tons of ore will be available for shipment in 1955 and that 10,000,000 tons are likely to be shipped in 1956. It is also pointed out that vessels of eighteen to twenty-eight thousand tons capacity will be used in transporting the ore to the north Atlantic ports; that a large number of railroad cars will be required; that economic necessity will require the movement to take the route from Seven Islands to the mills entailing the lowest transportation costs; and that alternate ports at equal rates are required in order to avoid congestion and to give the steel mills the opportunity to select the port to be used.

In the Commission's report, reference is made to its opinion In the Matter of Rate Differentials, 11 I.C.C. 13, which considered the Baltimore differential in 1905. The Commission said that at that time ocean rates favored the northerly ports but now iron ore moves in both chartered vessels and vessels owned by steel companies, and since 1920 ocean rates generally have been equalized with respect to voyage charters to the north Atlantic ports, but in some circumstances there is a saving of cost in routing the ore to the port nearest point of origin and that this might be true on a time charter arrangement or for an integrated shipper. The Commission then pointed out the approximate ocean distances from various points of origin to the Atlantic ports and also set out the figures which showed the amounts of Labrador ore received at Baltimore and at Philadelphia in the period from July 31 to December 5, 1954. The Commission, however, made no specific findings as to the ownership of the vessels in which this ore was carried to the two ports or as to the difference in cost between a voyage to Philadelphia and a voyage to Baltimore. The Commission's figures as to the tonnage re-

ceived at these two ports is limited to the period from July 31 to December 5, 1954, and no evidence was offered or considered as to the shipments during the year 1955 and 1956 preceding the date of the Commission's decision. The Commission did not pass on the testimony heretofore referred to in this opinion indicating that Labrador ore would seek the port offering the lowest cost of transporation from the point of origin to the destination in steel producing territory.

The Commission did not undertake to appraise the relative weight of the various factors entering in its decision, but Division 2 stated the following general conclusions with respect to the proposed rates from Philadelphia, New York and Boston:

"The evidence in support of the proposed adjustment from Philadelphia is substantially stronger than that offered in behalf of the proposed rates from New York and Boston. We are convinced that, in view of the earnings that would be yielded by the suspended rates from Philadelphia, such rates are not below a minimum reasonable level. We are of the view further that establishment of the proposed rates from Philadelphia will not result in disrupting the existing port relationship on traffic generally to destinations in differential territory. As indicated, the rates on iron ore from Baltimore and Philadelphia to the Pittsburgh area have been on a parity for over 50 years without disturbing the port relationship on the other commodities, and no good reason appears why the extension of this parity to ore-consuming points beyond Pittsburgh should change this situation. The record is persuasive that the iron ore tonnage through Baltimore will probably continue to increase regardless of the movement through Philadelphia.

"Moreover, in administering the provisions of the act the Commission is required to carry out the national transportation policy, which has for its ultimate objective the development, coordination, and preservation of a national transportation system adequate to meet the needs of the commerce of the United States, of the Postal Service, and of the national defense. The evidence is certain that in the years to come a large proportion of the iron ore used in this country will originate in foreign countries. This iron ore is and will be an important factor in national defense. Especially in case of national emergency, it is highly desirable that the needs of the steel industry be not jeopardized by forced reliance upon one port which could be incapacitated through congestion or other cause, and that, in the interest of national defense, Philadelphia and Baltimore be placed on a rate parity on imported iron ore as proposed in the schedules filed to become effective on February 19, 1953. Such a parity would not result in undue preference or prejudice."

Division 2 reached the ultimate conclusion that the proposed rates from Philadelphia to the differential territory were just and reasonable but that the rates from New York and Boston were not shown to be just and reasonable.

The general conclusions of the full Commission reaffirmed Division 2 with respect to rates from Philadelphia. They found that a substantial increase in iron ore imports would continue in that Labrador tonnage would increase to 10,000,000 tons in 1956 and to a greater extent in later years, and that the tonnage through Baltimore would probably continue to increase notwithstanding the maintenance of a parity rate with Philadelphia and also with New York. The Commission also reaffirmed the conclusions of Division 2 with respect to the necessity for parity in carrying out the national transportation policy. In this respect it said:

"As stated in the prior report, we are required to administer the

act so as to carry out the national transportation policy, which has for its ultimate objective the development, coordination, and preservation of a national transportation system adequate to meet the needs of the commerce of the United States, of the Postal Service, and of the national defense. Iron ore is a commodity which not only is of importance to the carriers in that it can and should reasonably bear its full share of the transportation burden, but it is of vital importance to the national defense. Thus, it is highly desirable that the carriers be permitted, within lawful bounds, to establish rates which will permit the movement of this traffic through several ports. These matters, among others of record, have been given consideration in reaching our conclusions herein."

New York and Boston rates:

The railroads serving New York and Boston pointed out the importance of being allowed to share in the new traffic based upon the importation of iron ore so as to replace the large revenues now received from domestic iron ore moving eastward from the Minnesota-Michigan ranges. The railroads also stressed the fact that business interests could not be expected to invest capital in constructing unloading facilties at New York or Boston unless parity of rates was established with Baltimore and Philadelphia, enabling the more northerly ports to share in the business; and they also emphasized the importance of having one or more ports available to handle the new importations.

Division 2 of the Commission, however, pointed out the greater distances from New York and Boston to the differential territory and resulting in the smaller earnings at these ports under parity of rates. It said:

"  *  *  *  From New York and Boston to the 7 destinations in the Youngstown area, the short-line distances average 487 and 642 miles, respectively, whereas to the same destinations the short-line distances average 424 miles from Philadelphia and 380 miles from Baltimore. The average short-line distance from Philadelphia exceeds that from Baltimore by only 11.6 percent whereas the like distances from New York and Boston are greater by 28 and 70 percent, respectively, than the distance from Baltimore.

"The proposed rates from Philadelphia compare favorably with rates applicable on iron ore from and to points in central and truckline territories and thus come within the 'zone of reasonableness' to which reference is made in New York Central R. Co. v. United States, supra. The proposed rates from New York and Boston would produce substantially lower revenues from those from Philadelphia. Moreover, the record shows that the facilities at New York and Boston are not adequate for the unloading of iron ore in substantial lots, and there is no positive indication that adequate facilities would be constructed thereat or that any substantial movement through those ports under the proposed rates could be expected. We conclude that, in the circumstances, the proponents of the proposed rates from New York and Boston have not sustained the statutory burden placed upon them to prove that these rates are just and reasonable."

Subsequent to the decision of Division 2 additional testimony was taken in which witnesses for the Boston and Maine and the New York, New Haven and Hartford indicated that unloading facilities would be established at Boston if equal rates with Baltimore were permitted, and similar representations as to the establishment of facilities at New York were made by persons interested in the development of that port. It was however made clear by all of the witnesses that facilities would not be established without assurances of parity of rates.

The Commission then made a comparison of revenues from the four north Atlantic ports to destinations in the Youngstown area. In one computation, using short-line distances, the following tabulation was made of the car-mile and ton-mile revenues on an average load of 62 gross tons and the rate from Baltimore of $3.035, which included the Ex-Parte No. 175 increase, i. e., a general increase applied by the Commission to all the rates:

| From: | Short-Line Distances miles | Car-Mile cents | Ton-Mile mills |
|---|---|---|---|
| Baltimore .......... | 378 | 49.8 | 8.0 |
| Philadelphia ........ | 424 | 44.4 | 7.2 |
| New York .......... | 490 | 38.4 | 6.2 |
| Boston ............. | 646 | 29.1 | 4.7 |

The Commission then considered certain cost studies submitted by the Erie Railroad for the single line haul from New York to Youngstown and for the joint haul with other railroads from Boston, and stated the final conclusion:

"We have carefully considered all of the evidence pertaining to the estimated out-of-pocket cost from New York and Boston. After restating the costs on the bases indicated, including the distribution of the costs of freight-train repairs, depreciation, and rentals of other than mileage cars over freight-train car-miles, loaded and empty, and the application of the unit cost to the loaded and empty car-miles of the imported ore traffic, we conclude that $2.647 and $3.42 would more nearly approximate the out-of-pocket costs per gross ton from New York and Boston, respectively. On these bases, the rate of $3.035 would exceed the cost from New York by 38.8 cents per gross ton, but would be 38.5 cents less than the cost from Boston."

On this basis the Commission found that the Baltimore rate would be just and reasonable as applied to New York, but would not be just and reasonable as applied to Boston.

The Commission also found that the $2.51 rate from Baltimore to Youngstown proposed by the Baltimore railroads as of February 16, 1953, would not be just and reasonable despite the fact that a comparison of the car-mile and ton-mile revenues via short line distances under the $2.71 rate (without the Ex-Parte No. 175 increase) from New York to Youngstown, with similar revenues under the $2.51 rate from Baltimore, shows that the latter would exceed the former. The comparison is shown by the following table:

| To Youngstown, Ohio | | | |
|---|---|---|---|
| From: | Rate | Car-Mile cents | Ton-Mile mills |
| Baltimore .......... | $2.51 | 41.2 | 6.6 |
| New York .......... | 2.71 | 34.3 | 5.5 |

In general, the Commission concluded that the natural advantages to which the Port of Baltimore would ordinarily be entitled were outweighed by the need to maintain ports of entry for iron ore at Philadelphia and New York and that this should be accomplished by diverting traffic from Baltimore to the other ports to such an extent that the facilities already established at Philadelphia may

be more extensively and profitably used, and so that New York would be encouraged to build facilities which it does not now possess.

█ The weight to be given to the administrative findings of the Commission and the scope of the authority of the reviewing court are well established. The expert judgment of the Commission in respect to matters in the field committed to it by Congress must be recognized and its conclusions, if supported by substantial evidence on the whole record, must be accepted. The Court is not at liberty to substitute its judgment for that of the Commission. As was said in Interstate Commerce Commission v. Union Pacific R. Co., 222 U.S. 541, 547, 32 S.Ct. 108, 111, 56 L.Ed. 308:

"In determining these mixed questions of law and fact, the court confines itself to the ultimate question as to whether the Commission acted within its power. It will not consider the expediency or wisdom of the order, or whether, on like testimony, it would have made a similar ruling. 'The findings of the Commission are made by law *prima facie* true, and this court has ascribed to them the strength due to the judgments of a tribunal appointed by law and informed by experience.' Illinois Central R. Co. v. I. C. C., 206 U.S. 441, 27 S.Ct. 700, 51 L.Ed. 1128. Its conclusion, of course, is subject to review, but, when supported by evidence, is accepted as final; not that its decision, involving, as it does, so many and such vast public interests, can be supported by a mere scintilla of proof, but the courts will not examine the facts further than to determine whether there was substantial evidence to sustain the order."

█ The Commission is not required to make detailed findings of fact but must make the basis of its decision clear so that the reviewing court may perform its function. The matter was well stated by Judge Magruder in New York Cent. R. Co. v. United States, D.C., 99 F.Supp.

394, 400, affirmed Interstate Commerce Comm. v. New York Cent. R. Co., 342 U.S. 890, 72 S.Ct. 201, 96 L.Ed. 667:

"In Beaumont, S. L. & W. Ry. Co. v. United States, 1930, 282 U.S. 74, 86–87, 51 S.Ct. 1, 75 L.Ed. 221, the Supreme Court, while upholding a Commission order, took occasion to criticize the Commission for the unnecessary burden cast upon the reviewing court by failure of the Commission to include in its report a complete statement showing the grounds upon which its determinations rested. Just how far the Commission is obliged by statute to go in this particular is not so clear as it might be. The Commission does have the duty to set forth in its report the 'basic' or 'essential' or 'quasi-jurisdictional' findings necessary to support its ultimate conclusion, though it must be recognized that such requirement is sometimes obscured in vague questions of degree. United States v. Chicago, M., St. P. & Pac. Railroad Co., 1935, 294 U.S. 499, 55 S.Ct. 462, 79 L.Ed. 1023; United States v. Baltimore & Ohio Railroad Co., 1935, 293 U.S. 454, 463, 55 S.Ct. 268, 79 L.Ed. 587; Florida v. United States, 1931, 282 U.S. 194, 215, 51 S.Ct. 119, 75 L.Ed. 291."

See also United States v. Chicago, M., St. P. & P. R. Co., 294 U.S. 499, 504–505, 55 S.Ct. 462, 79 L.Ed. 1023; Eastern Central Motor Carriers Association v. United States, 321 U.S. 194, 211–212, 64 S.Ct. 499, 88 L.Ed. 668; and Secretary of Agriculture v. United States, 347 U.S. 645, 653, 74 S.Ct. 826, 98 L.Ed. 1015, where the failure of the Commission to explain adequately its departure from prior norms led to a remand of the case for more explicit findings.

The specific question which the Commission decided was whether the prospective increase in the importation of iron ore, especially ore from Labrador requires or justifies the striking down of the long established differential in favor

of Baltimore in order to enable Philadelphia and New York to have a share of the traffic and thereby insure their maintenance as ports of entry for the product.

The Commission in reaching its conclusions must of course give effect and adhere to the national transportation policy declared by Congress, which provides for the promotion of sound economic conditions among the several carriers and the establishment of reasonable charges for transportation services without unjust discrimination, undue preferences or advantages and without unfair or destructive competitive practices, to the end that a national transportation system may be built up, adequate to meet the needs of the commerce of the United States and of the Postal Service and of the national defense. See Preamble to 49 U.S.C.A. §§ 1, 301, 901 and 1001. However, in effecting this policy it is made unlawful for any carrier to give any undue or unreasonable preference to any person, locality or port, or to subject any person, locality or port to undue or unreasonable prejudice or disadvantage. 49 U.S.C.A. § 3(1). The statute also provides that when any schedules stating a new rate are filed the Commission is required to have a hearing as to the lawfulness of the rate and the burden of proof is upon the carrier, proposing the rate to show that it is just and reasonable. 49 U.S. C.A. § 15.

■ In this case the Commission has concluded that the burden was met and we must determine whether the Commission has made basic findings sufficient to support its conclusions and whether there was substantial evidence to support the findings. In upholding parity of rates for Baltimore, Philadelphia and New York the Commission has disregarded the disparity of distances and thus in effect has approved a lower rate from Philadelphia and New York than the rate from Baltimore. This ruling, moreover, has upset a railroad and Commission practice of many years duration in which the factor of distance was given

effect. Such discrimination is not of itself illegal, for there are numerous instances amongst the myriad rates on file in which disparity of distances are necessarily disregarded in the operation of transportation systems. To condemn a rate on this score it must be shown that, in violation of Section 3 of the statute, the rate results in undue or unreasonable preference or inflicts undue or unreasonable prejudice upon certain territory involved. See State of New York v. United States, 331 U.S. 284, 305, 67 S.Ct. 1207, 91 L.Ed. 1492; United States v. Illinois Central R. Co., 263 U.S. 515, 524, 44 S.Ct. 189, 68 L.Ed. 417.

What are the findings upon which the Commission relies as the basis for its conclusion that there should be parity of rates between the ports notwithstanding the factor of distance? As to Philadelphia and Baltimore they seem to be:

1. That there is parity in respect of rates between Baltimore and Philadelphia as to other routes which involve differences in distance;

2. That in any event the difference in distance to the differential territory, measured from Philadelphia and Baltimore, is so insignificant that it should be disregarded, and

3. That the needs of the producers of steel and the requirements of the Postal Service and of the national defense make essential the maintenance of a plurality of ports for the importation of iron ore into the United States.

■■ The propriety and sufficiency of these findings must be appraised against the historic background in which the differential in favor of Baltimore has been maintained. Undoubtedly it originated in the natural advantages derived from the shorter distance of the port to destinations in the west and for this reason has been recognized for many years as a dominant factor in the rate relationships between the competing ports not only by practical railroad men

but by impartial governmental authority in control. This practical solution of the difficulties arising from competition was based on solid legal ground, for it is settled that the law does not attempt to equalize opportunities among localities and that the natural advantage which belongs to a locality does not constitute a preference. United States v. Illinois Cent. R. Co., 263 U.S. 515, 524, 44 S.Ct. 189, 68 L.Ed. 417; State of New York v. United States, 331 U.S. 284, 331–332, 67 S.Ct. 1207; Alabama G. S. R. Co. v. United States, 340 U.S. 216, 229, 71 S.Ct. 264, 95 L.Ed. 225. The Commission itself is without authority to adjust rates and differentials for the purpose of diverting traffic from one locality to another simply on the ground that too much traffic passes through one gateway and too little through another. Texas & Pacific R. Co. v. United States, 289 U.S. 627, 639, 53 S.Ct. 768, 77 L.Ed. 1410.

■ This does not mean, of course, that rates are to be rigidly proportioned to respective distances or that a carrier may not reduce its rates to meet competition within the zone of reasonableness, but differences in rates based upon differences in length of haul, density of traffic and other elements of the cost of service are within a long standing practice of rate making, and a rate may not be filed for the purpose of diverting traffic from one locality in order to build up another. Texas & Pacific R. Co. v. United States, 289 U.S. 627, 636, 639, 53 S.Ct. 768. Even if a reduced rate is reasonable, it is unlawful if it results in undue prejudice. State of New York v. United States, 331 U.S. 284, 297, 298, 67 S.Ct. 1207. The Commission in reaching its conclusion must consider all of these factors and may not condemn a difference in rates "unless it is shown that it is not justified by the cost of the respective services, by their values, or by other transportation conditions." United States v. Illinois Cent. R. Co., 263 U.S. 515, 524, 44 S.Ct. 189, 193.

In passing upon the merits of the case, the Commission gave no consideration to the cost or value of the services of the railroads competing for traffic at Philadelphia and Baltimore. No evidence on these points was offered or required; but the ultimate finding of the Commission as to distances from Philadelphia and Baltimore to Central territory was that the difference is so insignificant that the service from both ports is substantially identical. Evidence to support this finding seems to us to be lacking. Not only does the disparity, which had been considered substantial for many years, still exist, but the only standard of measurement proffered by the Commission for its finding was obviously incorrect. The Commission declared that the actual operating route from Philadelphia to Central territory is only 11 miles greater than the operating route from Baltimore. This seems convincing until it appears, from a careful reading of the decision, that the Commission is comparing the distance via the Pennsylvania from Baltimore with the distance via the Pennsylvania from Philadelphia and that in doing so it measures the distance from Philadelphia over a direct route, but measures the distance from Baltimore over a circuitous line through Perryville, which the railroad company adopts for its own convenience. Clearly this treatment was wrong. The comparison should be made on the same basis in each instance, for example, between the short line distances or between the short tariff distances from both ports, which shows a difference of 47 miles in the one case and 24 miles in the other. It is fair to say that the Commission, contrary to its former policy, either gave no weight whatever to the factor of distance or found that it was overborne by the general policy of supplying the needs of national commerce and the requirements of national defense.

We do not overlook the existence of parity of rates despite disparity of distances in respect to other commodities over other routes to which the Commission referred in its decision, seemingly as precedent for its present action. There was nothing new in this situation.

These other rates had long existed but in spite of them the differential in favor of Baltimore on traffic moving to the Central territory had been maintained and carriers serving the port in reliance upon it had adjusted their rates and provided and maintained adequate facilities. We think that these other rates furnish no reasonable basis for change of view on the part of the Commission.

It is obvious that the principal basis for the Commission's decision was its finding that parity of rates on imported iron ore moving westerly from the Atlantic Coast to the interior was necessary to insure the maintenance of New York, Philadelphia and Baltimore as ports of entry in furtherance of the policy of Congress to build up a national transportation system. How far the Commission's authority extends in this direction is an interesting and important question. The respondents stress the passage of the Act of September 18, 1940, 54 Stat. 899, whereby the Act to regulate commerce was amended to include the introductory declaration of the national transportation policy. This amendment has been cited in a number of decisions which hold that the Commission must follow it as a guide in the enforcement of all the provisions of the statute.[10] No one suggests, however, that the Commission has general authority to build up the transportation system of the country as it deems best in disregard of the right of a locality to enjoy its natural advantages, or in disregard of Section 3 of the statute which prohibits unlawful preferences and unlawful discrimination. At most the national needs constitute one of the factors to be considered while the other factors which have entered into the practice of rate making from the beginning must still be taken into account, the Commission retaining its power to give appropriate weight to each of them.

For our purposes it is enough to determine whether there is substantial evidence to support the finding that a radical change in the rates was needed to support the national policy. In the first place, it is to be noted that there is no evidence of financial weakness on the part of the railroads involved as has led the Commission in some cases to fix rates in aid of the financial necessities of certain carriers. See New England Divisions cases [Akron, C. & Y. R. Co. v. United States], 261 U.S. 184, 43 S.Ct. 270, 67 L.Ed. 605. The decision of the Commission is based on the general conclusion that the northerly ports will have no share in the transportation of imported iron ore so long as the differential exists because ocean freights have been generally equalized since 1920 and the ore will inevitably be shipped to the port which enjoys the cheapest railroad rate to the interior.

Definite findings are made as to the ocean distances from major sources of iron ore to the north Atlantic ports, which show the distances from Labrador to be 950 miles to Boston, 1,187 miles to New York, 1,320 miles to Philadelphia and 1,470 miles to Baltimore; and it is said that a round trip between Labrador and Baltimore requires about three more days than a round trip between Labrador and Boston. The Commission, however, does not attempt to review the considerable body of testimony bearing on the relative costs of ocean travel to the several destinations. A witness is quoted as saying that at the present time iron ore from foreign ports moves both in vessels owned by the steel companies and in chartered vessels; that charter agreements may be voyage charters or time charters; that the ocean rates of voyage charters are equalized to all North American ports; but that in some instances there is a cost saving in routing ore to the nearest port "on a time charter or for an integrated shipper."

10. Luckenbach S.S. Co. v. United States, D.C., 122 F.Supp. 824, affirmed 347 U.S. 984, 74 S.Ct. 850, 98 L.Ed. 1120; Atlanta & St. Andrew's Bay Ry. Co. v. United States, D.C., 104 F.Supp. 193;

United States v. Great Northern R. Co., 343 U.S. 562, 576, 72 S.Ct. 985, 96 L. Ed. 1142; Pacific Inland Tariff Bureau v. United States, D.C., 129 F.Supp. 472.

These findings are vague and inconclusive for they do not show to what extent differences in distance by sea will influence the movement of the ore. There was direct testimony that water costs bear a direct relationship to the time spent in transit; that the investments in large ore carrying vessels and operating costs are high, ranging from $1,000 to $2,000 per day; that the shipping season from Labrador is short and that time consumed in making round trips is an important element in moving the maximum tonnage to the destination; that vessels under a time charter and vessels owned by the steel companies would be routed to the nearest port, all other factors being equal; and that the ownership of vessels by the steel companies is expanding. The weight of all this testimony tends strongly to support the view that ocean costs will be an influential if not a determining factor in selecting the ports of destinations, which basis is lacking for the general conclusion of the Commission that without parity of rates Philadelphia will have no share in the traffic. On the contrary, shipments during a few months in 1954, the only period considered, indicate that under parity the ore will go to Philadelphia rather than to Baltimore, since Philadelphia enjoys the double advantage of smaller ocean costs and the most modern unloading facilities.

In the absence of specific findings, it does not seem reasonable to destroy a long established differential on the strength of which the railroads serving Baltimore have made large investments and the commercial interests of the port have made their arrangements. Obviously it is no answer to prophesy that the chances are that Baltimore will not suffer a loss of total tonnage under parity because the volume of imports is expected to greatly increase. The port will still be entitled to the benefits of its geographical position and the expected profits of the new business may not be diverted merely to satisfy the desire of other ports to share therein.

We think, however, that the record furnishes a reasonable basis for the decision of the Commission to retain parity of rates between Baltimore and Philadelphia in respect to traffic to Pittsburgh. Similar reasons for the maintenance of the status quo apply as in the case of Baltimore. It is true that, so far as iron ore is concerned, only a paper rate was involved until recently; nevertheless, parity has existed for more than 50 years with the acquiescence of Baltimore, and it was retained without objection in the revision of rates in 1950 when the rate of imported iron ore from Philadelphia to the Pittsburgh area was reduced by the same amount as the rate from Baltimore. While there had been no significant movement of iron ore from Philadelphia to the steel mills in the Pittsburgh area during this period, there was, as the report of Division 2 of the Commission shows, a substantial movement from Baltimore to this district. The Pennsylvania Railroad announced its intention, in August 1951, to erect a modern unloading facility in South Philadelphia with the obvious purpose to share in this traffic and in its expected increase, but no objection to the existing parity of rates came from the Baltimore railroads until they made their tactical move in 1953 in order to preserve the consistency of their position.[11] In our opinion, it is of great significance that Philadelphia interests have made a large capital investment in providing unloading facilities in the belief that the historic situation would be retained; and it would be unreasonable at this time to deny them the opportunity

11. The respondent railroads contend that parity as to Pittsburgh is inconsistent with the differential as to the Central territory, pointing out that Youngstown, one of the points in that territory, is 66 miles distant from Pittsburgh over the Pennsylvania Railroad as compared to 76 miles over the Baltimore and Ohio. This incongruity, however, does not present a new element for it has existed throughout the history of the differential and, in any event, we are concerned not with the comparative distances from Pittsburgh but with comparative distances from the ports of Philadelphia and Baltimore.

to make use of the structure which they have set up.

The lack of substantial basis for the allowance of parity to the Port of New York is shown by what has already been said; but it may be added that the approval of parity between New York and the more southerly ports, notwithstanding considerable differences in distances, strengthens the impression that the Commission holds the view that the conventional factors of rate making must yield to considerations of the general welfare. Aside from these considerations the New York decision rests on certain cost data showing that on the Baltimore level a rate from New York would exceed the costs by 38.8 cents per ton. For this reason alone the rate was found to be just and reasonable; and yet in the same opinion the Commission found that the rate of $2.51 from Baltimore, proposed by the Baltimore railroads to take effect February 16, 1953, that is to say, 20 cents under the current rate, would not be just and reasonable, although the evidence shows that the return thereon would exceed the return on the New York rate which the Commission approved. As the four dissenting commissioners point out, the only justification in the record for the proposed rates from New York "is bottomed solely on the desire to meet the competition of Philadelphia and Baltimore."

We conclude (1) that the orders of the Commission should be affirmed insofar as they disapprove the schedules filed to become effective on February 16, 1953, proposing reduced rates from Baltimore to the Pittsburgh and Central areas, and the schedules filed to become effective on February 16, 1953 and March 11, 1953 from Philadelphia to the Pittsburgh and Central areas, respectively; and (2) that the orders be vacated insofar as they approved the schedules filed to become effective on February 9, 1953, proposing reduced rates from New York to destinations in the Central area, and that the continuance of such schedules should be enjoined; and (3) that, insofar as the orders approved the schedules to become effective February 9, 1953, for reduced rates from Philadelphia to Central territory, the case should be remanded to the Commission to make explicit findings as to the relative costs of ocean shipping of imported iron ore to the ports of Baltimore and Philadelphia and as to the traffic therein to be reasonably expected at these ports, if parity is continued or if the differential is restored, taking into consideration the volume of traffic that has passed through these ports since February 19, 1954, when parity went into effect; and (4) that, pending said findings and a decision based thereon, parity between the ports of Philadelphia and Baltimore be retained upon the assumption that steps be taken to secure a prompt determination.

The orders of the Commission are modified and the case is remanded to the Commission for further proceedings consistent with this opinion.