BOSTON AND MAINE RAILROAD and the New York, New Haven and Hartford Railroad Company, Plaintiffs,

Port of Boston Commission, Intervening Plaintiff,

v.

UNITED STATES of America and Interstate Commerce Commission, Defendants,

The Baltimore and Ohio Railroad Company, Western Maryland Railway Company, Canton Railroad Company, Baltimore Association of Commerce, the Baltimore Chamber of Commerce, the Steamship Trade Association of Baltimore, Inc., Baltimore Custom House Brokers and Forwarders Association, the Mayor and City Council of Balti-more, the Pennsylvania Railroad Company, Maryland Port Authority, the Delaware River Port Authority, Chamber of Commerce of Greater Philadelphia, City of Philadelphia, Intervening Defendants.

Civ. A. No. 56-928-A.

United States District Court
D. Massachusetts.

June 27, 1957.

Robert G. Bleakney, Jr., and William Q. Keenan, Boston, Mass., for plaintiffs.

Henry E. Foley and Foley, Hoag & Eliot, Boston, Mass., for Port of Boston Commission, intervening plaintiff.

John H. D. Wigger, Atty., Dept. of Justice, Washington, D. C., Anthony Julian, U. S. Atty., and Andrew A. Caffrey, Asst. U. S. Atty., Boston, Mass., for United States of America and Interstate Commerce Commission, defendants.

I. K. Hay, Asst. Gen. Counsel, Washington, D. C., and Herman Mueller, Boston, Mass., for Interstate Commerce Commission, defendant.

Edwin H. Burgess, Anthony P. Donadio, Baltimore, Md., and Charles J. Henry, Jr., Baltimore, Md., Frederick Foster, Boston, Mass., Jervis Langdon, Jr., Baltimore, Md., for Baltimore & O. R. Co.

William C. Purnell, Baltimore, Md., for Western Maryland Ry. Co.

J. Crossan Cooper, Jr., Baltimore, Md., for Canton R. Co.

Harry C. Ames, Washington, D. C., for Baltimore Ass'n of Commerce, the Baltimore Chamber of Commerce, the Steamship Trade Ass'n of Baltimore, Inc., Baltimore Custom House Brokers & Forwarders Ass'n.

Thomas N. Biddison and F. Clifford Hane, Baltimore, Md., for Mayor and City Council of Baltimore.

Guernsey Orcutt and Richard R. Bongartz, Philadelphia, Pa., for Pennsylvania R. Co.

Theodore Chase, Boston, Mass., William L. Marbury, Baltimore, Md., Donald Macleay and Franklin G. Allen, Washington, D. C., for Maryland Port Authority.

Charles M. Ewing, Boston, Mass., Morris Duane and Duane, Morris & Heckscher, Philadelphia, Pa., Bruce A. Wallace, Camden, N. J., and Warren Price, Jr., Washington, D. C., for Delaware River Port Authority.

Charles M. Ewing, Boston, Mass., and Frederick H. Knight, Philadelphia, Pa., for Chamber of Commerce of Greater Philadelphia.

David Berger, City Sol., David E. Pinsky, Asst. City Sol., for City of Philadelphia, Philadelphia, Pa., intervening defendants.

Before MAGRUDER, Circuit Judge, and FORD and ALDRICH, District Judges.

MAGRUDER, Circuit Judge.

This suit is brought by the Boston & Maine Railroad and the New York, New Haven & Hartford Railroad Company (hereinafter jointly referred to as the Boston railroads), to set aside certain parts of an order dated October 1, 1956, of the Interstate Commerce Commission (hereafter the Commission) in Investigation and Suspension Docket No. 6074, Iron Ore from Eastern Ports to Central Freight Association Points (299

I.C.C. 195). The Port of Boston Commission intervened as a plaintiff, and the following parties intervened as defendants: The Baltimore & Ohio Railroad Company, the Western Maryland Railway Company, the Canton Railroad Company, the Baltimore Association of Commerce, the Baltimore Chamber of Commerce, the Steamship Trade Association of Baltimore, Inc., the Baltimore Custom House Brokers and Forwarders Association, the Mayor and City Council of Baltimore, the Pennsylvania Railroad Company, the Maryland Port Authority, the Delaware River Port Authority, the Chamber of Commerce of Greater Philadelphia, and the City of Philadelphia.

The complaint in this case attacks the Commission's determination that reduced railroad rates proposed by the Boston railroads from Boston to the so-called differential area in Ohio and Western Pennsylvania,[1] originally scheduled to become effective February 9, 1953, and October 21, 1954, and later, are noncompensatory and therefore not shown to be "just and reasonable" under the Interstate Commerce Act. 49 U.S.C.A. § 15. This determination was made by the Commission in its original report dated October 1, 1956, and in its Supplemental Report of March 19, 1957. The proposed rates would have given Boston parity with Baltimore in the transportation of import iron ore from those North Atlantic ports by rail to differential territory. Some familiarity with the history of the rates will be helpful for a proper understanding of the decision by the Commission and the present proceeding.

There has been in effect since 1877 a differential adjustment of rates on commodities between the North Atlantic ports and the differential territory. This was first established by agreement of the carriers serving the territory in order to avoid conflict and possibly mutually destructive rate wars; it appears that at one time ocean rates favored the more northern ports (Boston and New York), and the railroads decided to offset these ocean rates by rail differentials so as to enable the various ports to compete for import and export traffic on equal terms.[2] Prior to 1930 the differentials were applicable to both domestic and import-export traffic, but in that year the Commission ruled all domestic class rates from the scope of the differential rate structure and prescribed new scales of class rates from the various ports, based primarily on distance. See Eastern Class-Rate Investigation, 164 I.C.C. 314 (1930). Since these new domestic rates did not cover import-export traffic, the railroads in 1932 published new rates to cover the latter class of traffic, which were the same as the new domestic rates so far as Baltimore was concerned, but which preserved the standard differentials in favor of Baltimore which had originally been established in 1877 of 20 cents per gross ton with respect to Philadelphia and 60 cents per gross ton with respect to New York and Boston.

While the original agreement by the carriers in 1877 was voluntarily entered into, it has been considered by the Commission from time to time during the past sixty years and in each instance the differential rates have been found lawful. See, e. g., Chamber of Commerce of the State of New York v. New York Central & Hudson River R. R. Co., 24 I.C.C. 55 (1912); Port of New York Authority v. Baltimore & Ohio R. R. Co., 248 I.C.C. 165 (1941).

1. Differential territory is defined in Baltimore Chamber of Commerce v. Ann Arbor R.R. Co., 159 I.C.C. 691, 692 (1929), and includes the following seventeen points, all consuming or storage centers for iron ore: Midland, Farrell, Sharon and Sharpsville, Pennsylvania; Martins Ferry, Mingo Junction, Steubenville, Lowellville, Niles, Struthers, Warren and Youngstown, Ohio; Benwood, East Steubenville, Follansbee, Weirton and Wheeling, West Virginia.

2. The background of these differentials is discussed in detail in Matter of Differential Freight Rates to and from North Atlantic Ports, 11 I.C.C. 13 (1905), and Albany Port District Commission v. Ahnapee & W. Ry. Co., 219 I.C.C. 151 (1936).

Beginning in 1949, the carriers transporting import iron ore undertook a study of the rate structure, apparently in response to complaints from steel producers in the interior of the country which called attention to the increased volume of movement and other changed conditions which would justify an alteration in the long-established arrangement. As a result of this study, the Baltimore & Ohio, the Western Maryland, the Pennsylvania, and connecting lines established, as of October 9, 1950, reduced rates on iron ore from Baltimore to steel mills in differential territory.[3]

In August, 1951, the Pennsylvania, anticipating an increase in the volume of import iron ore, announced that it would erect a modern unloading facility in South Philadelphia which would enable it to share in the transportation of the commodity from Philadelphia to the interior. While in the process of erecting such a facility, the Pennsylvania published reduced rates on iron ore, to be effective February 9, 1953, from Philadelphia to the seventeen points in differential territory. Simultaneously, the New York Central, from the ports of New York and Boston, and the Erie Railroad, from the port of New York, published identical rates from New York and Boston to destinations in the differential territory on their respective lines. The effect of these publications was to reduce the rates on iron ore from Philadelphia, New York and Boston to differential territory to $2.71 per gross ton, the same rate which applied to Baltimore.[4] In order to meet this reduction, the Baltimore & Ohio and the Western Maryland then published, to be effective February 16, 1953, a reduced rate of $2.51 per ton, thus restoring a 20-cent differential in favor of Baltimore over Philadelphia, and restoring a portion of the differential over New York and Boston. No attempt was made by the Baltimore railroads to restore in full the previous differential of 60 cents over New York and Boston. The Pennsylvania countered with a rate reduction of 20 cents per ton in its rates from Philadelphia and Baltimore to differential territory, to be effective March 11, 1953.

The Baltimore & Ohio, the Western Maryland and certain other Baltimore interests protested the rate reductions by the other railroads, and all of the above-mentioned reductions were suspended by the Commission pending an investigation instituted on February 6, 1953. This was followed by a hearing and oral argument, and an order of Division 2 of the Commission on February 5, 1954, which approved the reduction originally published by the Pennsylvania, effective February 9, 1953, giving Philadelphia a parity with Baltimore, but canceled the tariffs of the New York Central and the Erie equalizing rates from New York and Boston with Baltimore. Division 2 also found that the February 16, 1953, tariffs of the Baltimore & Ohio and the Western Maryland, and the March 11, 1953, tariffs of the Pennsylvania were not just and reasonable and ordered them to be canceled.

Subsequently, the full Commission, on July 30, 1954, stayed the order canceling the rates from Baltimore, New York and Boston and reopened the proceeding. On October 1, 1956, the Commission rendered its decision, finding that the February 9, 1953, rates from Philadelphia and New York were justified but that the February 16, 1950, rates from Baltimore, the March 11, 1950, rates from Philadelphia, and the February 9, 1953, and October 21, 1954, rates from Boston, were all not justified and ordered them canceled. In other words,

3. At the same time the rate was reduced from Baltimore to Pittsburgh, but because these and certain other rate changes are irrelevant to the present controversy we shall in the course of this opinion omit further reference to them.

4. The rates are stated without the general increase for all railroads, approved in Ex Parte No. 175, Increased Freight Rates, 1951, 297 I.C.C. 17 (1955), to $3.035 per gross ton. This figure of $3.035 is the specific rate request by the Boston railroads which was denied by the Commission and now under review.

as matters stood after the Commission's decision of October 1, 1956, the rates from Baltimore, Philadelphia and New York were put on a parity, and the only remaining differential was one of 60 cents between all of these three ports and the port of Boston.

In reaching its decision with respect to the proposed Boston rate, the Commission concluded that the estimated cost study introduced by some of the Boston railroads showing a cost per gross ton of $2.76 was unacceptable. Instead, the Commission found that $3.42 would approximate the out-of-pocket costs [5] per gross ton from Boston, an amount which would exceed the proposed rate of $3.035 by 38.5 cents. (Subsequently, the Commission on its own motion reopened the proceeding to reconsider its calculations and, on March 19, 1957, issued a Supplemental Report which found the correct out-of-pocket cost per gross ton from Boston would be $3.259, an amount exceeding the proposed rate by 22.4 cents.)

Two complaints were filed seeking review of the Commission's decision of October 1, 1956. The first, to the United States District Court for the District of Maryland, was brought by the railroads servicing Baltimore and by certain civil authorities and commercial organizations of Baltimore, in order to set aside the orders which prescribed parity of rates among the ports of Baltimore, Philadelphia and New York. On April 26, 1957, the District Court of Maryland, 151 F.Supp. 258, held (1) that the orders of the Commission should be affirmed in so far as they disapproved the schedules proposing the rate of $2.51 from Baltimore and Philadelphia; (2) that the orders of the Commission be vacated in so far as they approved the

schedules proposing the rate of $2.71 from New York; (3) that, in so far as the orders approved the proposed rate of $2.71 from Philadelphia, the case should be remanded to the Commission for further findings; and (4) that, pending said findings and a decision based thereon, parity be permitted between the ports of Philadelphia and Baltimore.[6]

The second proceeding for review of the Commission's order was to this court and calls for the determination of the sole question of whether or not the Commission erred in disapproving the schedules filed by the Boston railroads which would reduce the rate from Boston to differential territory to $3.035, thus establishing parity between Boston and the other North Atlantic ports. (This now includes only Baltimore and Philadelphia, for under the decision of the District Court of Maryland New York no longer has parity.)

In dealing with this single issue, the scope of our inquiry is much narrowed by the fact that the Boston rate was disapproved by the Commission solely because it was found to be noncompensatory, that is, because it would not provide the carriers from Boston a return equal to their total out-of-pocket costs of transportation as those costs were determined by the Commission.

There has been some controversy before us about the precise ground on which the Commission rejected the proposed Boston rate, but we are disposed to accept the contention of the Boston railroads and the Port of Boston Commission that the Commission relied only on its finding that the rates were noncompensatory. Although the opinion of October 1, 1956, is not entirely explicit on the issue, what light there is supports

5. Out-of-pocket costs have been defined in New Automobiles in Interstate Commerce, 259 I.C.C. 475, 500 (1945), as "those expenses which are added by an increase, or reduced by a decrease in traffic, can be directly assigned to specific traffic movements, and are directly affected by the use of carrier facilities. The remaining, or constant expenses, are those incurred in connection with traffic as a

whole, which over a period of time, are unaffected by any increase or decrease in traffic volume, and as they are not capable of direct assignment, must be fairly apportioned."

6. As in the case of the Boston railroads, the original proposals of $2.71 should now be read as $3.035, taking into account Ex Parte No. 175.

this conclusion, and all doubt is in our view fully dispelled by the failure of the Commission at any point to refer to a different ground for decision and by an examination of the following conclusory language from the Supplemental Report of March 19, 1957: "we [the Commission] must conclude that the proposed rate is non-compensatory and *therefore* unlawful." (Italics added.)

Our function in this proceeding is thus merely to determine whether or not the key finding that the proposed reduced rate from Boston is noncompensatory should be affirmed. If so, it will follow that the Commission's ultimate *conclusion rejecting the reduced rate* from Boston must also be sustained, for it seems quite clear that it lies within the discretion of the Commission to reject a rate as unlawful which does not provide a return of out-of-pocket costs to the carriers. On the other hand, should we find that the Commission erred in its conclusion that the rate is noncompensatory, the case must be returned to the Commission for further findings as to the justness and the reasonableness of the proposed rate under the Interstate Commerce Act, 49 U.S.C.A. § 1 et seq. In such a case, the Commission would be compelled to consider a variety of pertinent factors. Because it is unlawful to subject any person, locality or port to undue or unreasonable prejudice or disadvantage, see 49 U.S.C.A. § 3(1), the Commission would be obliged to give due consideration to the natural geographical advantages possessed by the ports of Baltimore and Philadelphia over the port of Boston in the form of a far shorter railroad route to differential territory.[7] Moreover, it would have to take into account the tremendous increase in the movement of foreign iron ore to this country, including the assured prospect that by far the greatest amount of import ore will in the future come from Labrador, a point of origin giving the port of Boston a geographical advantage in sea transportation. Furthermore, it would have to gauge the influence of the National Transportation Policy which requires all provisions of the Act to be enforced, *inter alia*, with a view to maintaining a transportation system "adequate to meet the needs * * * of the national defense."[8] 54 Stat. 899, 49 U.S.C.A. note preceding section 1. And there are undoubtedly other considerations which would bear on the lawfulness of the proposed rates from Boston.

In our view of the case, however, it will not be necessary for the Commission to deal with these various considerations, for we conclude that the finding that the proposed rates are noncompensatory must be affirmed.

---

7. The short tariff route is the shortest route over which rates on iron ore are actually published. The short tariff routes to Youngstown, Ohio, in differential territory, of the railroads serving Baltimore, Philadelphia and Boston and which published reduced rates on iron ore, are as follows:

| From | Short Tariff Route, Miles |
|---|---|
| Baltimore: | |
| W. Md. | 381 |
| B. & O. | 395 |
| P. R.R. | 404 |
| Philadelphia: | |
| P. R.R. | 428 |
| Boston: | |
| N.Y.C. | 670 |
| B. & M. | 661 |
| N.Y. N.H. & H. | 692 |

Although natural geographical advantages as reflected in these short tariff route distances would be an important factor in determining a just and reasonable rate, it is clear that such distances are not dispositive in determining lawful rates. See, e. g., Port of New York Authority v. Baltimore & Ohio R.R. Co., 248 I.C.C. 165, 180 (1941).

8. At present there is no modern ore unloading facility at Boston, and no appreciable amount of iron ore is imported through that port. Witnesses for the Port of Boston testified that private interests were prepared to go forward with the building of a modern facility only if Boston can be assured a parity rate. In such a case an additional port would be available through which increasingly vital import iron ore could pass to the steel mills of the interior.

As indicated above, this finding was based on the Commission's analysis of a cost study introduced by complainants purporting to show their out-of-pocket cost of the contemplated iron ore movement from Boston. In rejecting the cost study submitted by the Boston railroads, the Commission made two major adjustments. It first determined that additional switching time of 11.9 minutes would be needed at Boston for cleaning and inspecting the empty cars and classifying them for outbound movement, and added 9.2 cents to the cost per gross ton for this reason. Secondly, it rejected the study's estimate of train expenses which was based on a per diem rate of $2.40 per car-day used in transporting the ore. It did this because the testimony of witnesses before the Commission was "somewhat conflicting as to the validity of the estimated total car-days required for this movement." The Commission computed the correct cost for car expense by distributing freight train car repairs, depreciation, and net car hire expenses of cars on the basis of freight car miles, loaded and empty, thus eliminating the necessity of estimating the number of days on which the cars would be used for the movement.

■ It is plain that, in reviewing the decision of the Commission, our function is not to pass in detail on the evidence of costs. By virtue of long-standing rulings of the Supreme Court, these are matters solely for the judgment of the administrative agency. In Illinois Commerce Commission v. United States, 1934, 292 U.S. 474, 481, 484, 54 S.Ct. 783, 786, 78 L.Ed. 1371, the Court said:

"Whether or not the cost study was representative, whether the study should have been more refined, and whether it should have been supplemented as appellants desired, are questions of fact, the determination of which is within the competence of the Commission. The Commission reached its conclusion after full hearing and thorough consideration of all questions presented. As the record affords a sufficient basis for the Commission's determination, it is not subject to review in the courts. See Manufacturers' Ry. Co. v. United States, 246 U.S. 457, 481, 38 S.Ct. 383, 62 L.Ed. 831; Assigned Car Cases, 274 U.S. 564, 580, 47 S.Ct. 727, 71 L.Ed. 1204.

" * * * Appellants reach their conclusion as to the reasonableness of the interstate rate by disregarding the cost study as evidence because, as is contended, it was erroneously considered by the Commission. But as we have already said it was for the Commission to determine whether the cost study was adequate or whether it was necessary to refine or supplement it in order to make it dependable evidence for the purpose of rate making. The study itself afforded evidence of the reasonableness of the rate fixed, and upon the whole record there was abundant support for the Commission's finding, which was carefully and thoroughly considered in its report. There is no basis upon which the courts, not authorized to weigh evidence, could reëxamine or disregard its conclusion." See also Ayrshire Collieries Corp. v. United States, 1949, 335 U.S. 573, 593, 69 S.Ct. 278, 93 L.Ed. 243.

The complainants before us are fully aware of these basic principles, for the Port of Boston Commission in its briefs concedes that "it is plainly not the province of this Court to determine costs or whether a rate is or is not compensatory," and that "it is not the Court's province to pass on the Commission's skill as a cost-finding agency." Accordingly, complainants do not seriously press an attack upon the cost findings of the Commission as they relate either to the switching costs or to the costs of freight cars. Instead, their case is premised on an entirely different theory, turning on the nature of the cost study submitted to the Commission. They maintain that the study did not purport to be be an out-of-pocket cost study in the normal sense of that term, but to be a "max-

imum" out-of-pocket cost study which was intentionally made to be conservative. Thus, it is said, the study did not take into account a very important fact bearing on the proposed operation which has substantial cost saving significance not reflected in the study, namely, that there is today, and can reliably be expected in the future, a substantial movement of empty open-top equipment westbound to the differential area, which equipment could and would be used in the movement westbound of iron ore. Complainants have attempted to persuade us of the cost savings which would necessarily result by taking this fact into account. They say that, "In hauling these cars empty, the carriers are imposing wear on their tracks, roadbeds, bridges and the like * * *. They are necessarily incurring hopper car rental costs, locomotive fuel and other operating expenses, locomotive maintenance expense, train crew wages, train dispatching and switching costs, maintenance of way expenses and other costs. * * * [T]he carriers from Boston will be in a position, with a competitive rate structure, to carry import iron ore westbound in these now empty hopper cars at only relatively minor additional cost to that presently incurred." Complainants thus maintain that on the record before it the Commission could not properly find that the transportation of import iron ore at the proposed rate from Boston to differential territory would be a losing proposition.

■ As tempting as the above presentation is, in our opinion it cannot withstand critical analysis. Section 15(7) of the Interstate Commerce Act provides: "At any hearing involving a change in a rate * * * the burden of proof shall be upon the carrier to show that the proposed changed rate * * * is just and reasonable * * *." This means, of course, that the Boston rail-

roads are called upon to introduce sufficient evidence to convince the Commission that the proposed rates are lawful. In attempting to meet this burden, the railroads prepared a comprehensive cost study, which necessarily had to proceed upon a given set of factual assumptions. It seems entirely reasonable to suppose that the carriers selected assumptions they thought most advantageous to them. For example, there are certainly cost advantages in assuming the return of 100 per cent empties: because the same equipment would always be available for use at Boston, a shorter amount of time would be needed for the gathering, switching and cleaning of cars. We cannot go along with the suggestion that the Boston railroads, now that the Commission has made cost calculations on the basis of their study, should be able to maintain in this proceeding that they could have made out better with a study embodying a different set of assumptions leading to a possibly lower cost.

In reaching this result, we need not express an opinion on the totally different situation which would be presented if the Boston railroads had introduced sufficient evidence before the Commission to warrant an explicit and supportable finding of transportation costs based on an alternative assumption of facts. But that is not the case here, for it is clear that the record lacks such evidence. Although the Boston railroads did present uncontradicted testimony that there is a steady and rather large flow of empty cars moving from east to west and that a substantial number of these cars had their eastern terminus within the Greater Boston area,[9] this meager showing is insufficient to lay the basis for a firm finding that utilization of these "empties" would in fact lower transportation costs. First of all, it is conceded that a substantial number of these empties— the estimates ranged as high as 50 per

---

9. A witness for the New York Central Railroad testified that in the year 1952 it moved 6967 "hoppers and gondolas" west out of the Boston district, and an additional 14,728 west from Springfield.

A witness for the Boston & Maine Railroad said that the three Boston railroads combined released approximately 250 empties per day.

cent—would be unfitted for carrying iron ore, thus reducing the number of available cars to make the round trip. Secondly, there are a host of additional costs which would result from using railway cars which had arrived in the general Boston area carrying assorted freight loads from the differential territory. The cars would have to be gathered together and brought to Boston from various railroad yards, a process involving expenditure both of labor and materials. Then the cars would probably have to be cleaned and provided with other services before being ready to transport iron ore. It is not difficult to suppose the possibility that other expenses would also have to be incurred.

If it appears that the above discussion of costs lacks sufficient specificity and is hopelessly hypothetical, it should be borne in mind that the record fails to contain evidence enabling us to make a more concrete analysis, and that the responsibility for making such a record lies with the Boston railroads. Indeed, it would be entirely speculative to assume that, if the Commission were now ordered to take new evidence of costs, premised on the utilization of empties, a lower cost estimate could be provided, and in particular that the proposed rate of $3.035 could be shown to be compensatory. We feel that the Boston railroads must be prepared to sink or swim with the cost study they submitted to the Commission, as properly modified, which we have no affirmative reason to believe did not reflect the lowest possible cost estimate. To decide otherwise would open the door to a potentially endless series of hearings and appeals. On the present record the Boston railroads have failed to satisfy the burden of proof imposed on them by Congress, and the Commission's determination that the proposed rates from Boston to differential territory would be noncompensatory was entirely proper.

■ Having reached this conclusion, we need only iterate our belief that it was within the power of the Commission to reject the proposed Boston rate solely on the ground that it was not compensatory. It is well settled that out-of-pocket costs "establish the floor of all rates", Class Rate Investigation, 1939, 262 I.C.C. 447, 693 (1945), and that a rate must cover the "out-of-pocket costs" and include "a proper return on investment" in order to be found "reasonably compensatory." New Automobiles in Interstate Commerce, 259 I.C.C. 475, 538 (1945). See also New York Central R. Co. v. United States, D.C.Mass.1951, 99 F.Supp. 394, 402, affirmed I. C. C. v. New York Central R. Co., 1951, 342 U.S. 890, 72 S.Ct. 201, 96 L.Ed. 667.

A judgment will be entered affirming the order of the Interstate Commerce Commission dated October 1, 1956, in so far as the said order cancels the schedules filed to become effective on February 9, 1953, October 21, 1954, and later, from Boston to destinations in the differential territory.