The **BALTIMORE AND OHIO RAIL-ROAD COMPANY**, Canton Railroad Company, Western Maryland Railway Company, Maryland Port Authority and Baltimore Association of Commerce

v.

**UNITED STATES** of America, Interstate Commerce Commission, and the Pennsylvania Railroad Company, Defendants,

and

Armco Steel Corporation, M. A. Hanna Company, Iron Ore Company of Canada, National Steel Corporation (Weirton Steel Company Division), Republic Steel Corporation, Wheeling Steel Corporation, the Youngstown Sheet and Tube Company, the Delaware River Port Authority, the City of Philadelphia, Intervening Defendants.

Civ. A. No. 13129.

United States District Court
D. Maryland.
Dec. 19, 1962.

William L. Marbury and Franklin G. Allen, Baltimore, Md., for plaintiffs. Of counsel: Jervis Langdon, Jr., Charles J. Henry, Jr., Albert W. Laisey, Baltimore, Md., for Baltimore & Ohio R. Co.; William C. Purnell, Baltimore, Md., for Western Maryland Ry. Co.; J. Crossan Cooper, Jr., Baltimore, Md., for Canton R. Co.; Donald Macleay, Washington, D. C., for Maryland Port Authority; Karl J. Grimm and J. Cookman Boyd, Jr., Baltimore, Md., for Baltimore Assn. of Commerce.

Lee Loevinger, Asst. Atty. Gen., John H. D. Wigger, Attorney, Department of Justice, Washington, D. C., and Joseph D. Tydings, U. S. Atty., District of Maryland, Baltimore, Md., for United States of America, defendant.

Robert W. Ginnane, General Counsel, H. Neil Garson, Associate General Counsel, Washington, D. C., for Interstate Commerce Commission, defendant.

George W. Constable, William P. Constable, Baltimore, Md., and Richard R. Bongartz, Philadelphia, Pa., for Pennsylvania Railroad Co., defendant.

Wendell D. Allen, Baltimore, Md., John F. Donelan, John M. Cleary, Eugene D. Anderson, Washington, D. C., for Armco Steel Corporation, M. A. Hanna Co., Iron Ore Co. of Canada, National Steel Corporation (Weirton Steel Company Division), Republic Steel Corporation, Wheeling Steel Corporation, and Youngstown Sheet & Tube Co., intervening defendants.

George M. Radcliffe, Baltimore, Md., Morris Duane, Francis W. Sullivan, Philadelphia, Pa., Bruce A. Wallace, Camden, N. J., Warren Price, Jr., Washington, D. C., for Delaware River Port Authority, intervening defendant.

David Berger, Lewis Kates, Philadelphia, Pa., and Charles E. Orth, Jr., Baltimore, Md. Of counsel: William C. Burt and Robert M. Beckman, Washington, D. C., for City of Philadelphia, intervening defendant.

Before SOPER, Circuit Judge, THOMSEN, Chief District Judge, and WATKINS, District Judge.

**R. DORSEY WATKINS, District Judge.**

This is an action by plaintiffs [1] against the original defendants [2] to supend, enjoin, set aside and annul that portion of a decision and order of the Interstate Commerce Commission, dated June 15, 1961, 314 I.C.C. 149, in proceedings entitled Investigation and Suspension Docket No. 6074, Iron Ore from Eastern Ports to Central Freight Association Points, and Investigation and Suspension Docket No. 6742, Iron Ore, Ex-Labrador, Canada to Youngstown, Ohio [3] which re-

---

1. The Baltimore and Ohio Railroad Company, Canton Railroad Company, Western Maryland Railway Company, Maryland Port Authority and Baltimore Association of Commerce.

2. United States of America, Interstate Commerce Commission and the Pennsylvania Railroad.

3. Plaintiffs in their brief (page 6) state:
"* * * Upon the opening of the St. Lawrence Seaway, the rate involved in No. 6742, from Contrecoeur to Youngstown, ceased to be important, and therefore the plaintiffs in this case seek relief only from the Philadelphia parity."
In argument, plaintiffs apparently sought to retract this concession. The point, however, has not been briefed or argued, and is treated as withdrawn.

quires a parity of rates on import iron ore from Baltimore, Maryland and Philadelphia, Pennsylvania, to certain destinations in the States of Ohio, Pennsylvania and West Virginia known as "differential territory" or the "17 points"[4], to restrain and enjoin the United States of America, and the Interstate Commerce Commission, from enforcing and making effective said portion of the Commission's decision and order entered in those proceedings; and further to prevent and enjoin the Pennsylvania Railroad Company from continuing in effect certain rates on iron ore from Philadelphia to the same destinations in Ohio, Pennsylvania and West Virginia, which were published to become effective February 9, 1953 and which became effective February 19, 1954.

Answers were filed by the original defendants. On motions and petitions, interventions as defendants were allowed as indicated in the caption, and answers were filed by the intervenors.

The early background of this litigation is set forth at length in the previous decision of the three-judge court for this District, Baltimore & Ohio Railroad Company v. United States, D.Md.1957, 151 F.Supp. 258, and need not be repeated in extenso. A brief summary, however, with special reference to subsequent developments, should be helpful.

Prior to 1950 the railroad rates on imported iron ore from Baltimore and Philadelphia to the destinations in issue had been fixed in conformity with an agreement between the carriers under which the rate from Baltimore was 20 cents per ton lower than that from Philadelphia.

In 1949, substantial reductions were made in the rates on imported iron ore from Baltimore to 49 points in Central Territory, including the 17 points, to take effect October 9, 1950. Simultaneously, the rate from Philadelphia to

Pittsburgh was reduced to the Baltimore level continuing a parity that had existed since 1903; but from Philadelphia to points west of Pittsburgh (including the 17 points, and points west thereof) the rates were not reduced. Accordingly, the differential from Philadelphia with respect to these points was not the standard differential of 20 cents, but that amount plus the amount of the Baltimore reductions. Probably this concession of the traffic to Baltimore was because until 1954 Philadelphia had no large, modern ore unloading facilities.

In 1953 the Pennsylvania Railroad filed rates, to become effective February 9, 1953, from Philadelphia to the 17 points, at the same level as the Baltimore 1950 rates. Railroads serving New York and Boston filed rates on the Baltimore level to those of the 17 points served by their lines. In an effort to preserve the differential, the Baltimore and Ohio Railroad and Western Maryland Railway filed new rates from Baltimore 20 cents per ton under the 1950 rates, and therefore under the proposed rates from Philadelphia. The Pennsylvania Railroad protested the lower Baltimore rates, and filed a second round of reductions, which were protested by the Baltimore interests. The Interstate Commerce Commission suspended all the proposed rates.

In 1954, Division 2 of the Interstate Commerce Commission disapproved the New York and Boston reductions, approved the Philadelphia reduction to 1950 parity with Baltimore, and disapproved the further reductions from Baltimore designed to re-establish a 20 cent differential under Philadelphia, 291 I.C.C. 527. In 1956 the full Commission affirmed Division 2, except that it approved parity rates from New York, as well as from Philadelphia and from Baltimore. The Commission agreed with Division 2 in the disapproval of Boston parity, and this part of its order was affirmed. Bos-

---

4. Farrell, Midland, Sharon and Sharpsville, Pa.; Lowellville, Martins Ferry, Mingo Junction, Niles, Struthers, Steubenville, Warren and Youngstown, Ohio; and Ben-

wood, East Steubenville, Follansbee, Weirton and Wheeling, W.Va., sometimes referred to as "differential territory."

ton & Maine Railroad v. United States, D.Mass. 1957, 153 F.Supp. 952.

Upon appeal by the Baltimore interests from the order approving parity for Philadelphia and New York with Baltimore, this court reversed the Commission as to the New York parity rates [5], and remanded the case to the Commission for more specific findings justifying the destruction of the long established Baltimore differential, stating that the mere prophesy that Baltimore would not suffer a total loss of tonnage under parity would not suffice, since the port was entitled to the benefits of its geographical position (151 F.Supp. at 277), including the shorter rail haul to the West. The Commission was directed "to make explicit findings as to the relative costs of ocean shipping of imported iron ore to the ports of Baltimore and Philadelphia and as to the traffic therein to be *reasonably expected at these ports, if parity is continued or if the differential is restored,* taking into consideration the volume of traffic that has passed through these ports since February 19, 1954, when parity went into effect" [6], and that pending said findings and a decision thereon, parity between Baltimore and Philadelphia would be retained "upon the assumption that steps be taken to secure a prompt determination." (151 F.Supp. at 278; emphasis supplied.)

On appeal by the Philadelphia and New York interests, the United States Supreme Court entered a per curiam opinion and order, vacated such portion of the order of this Court as did not affirm the order of the Commission, stating that the Commission was not precluded from a consideration of the interrelationship of the Baltimore-Philadelphia-New York rates, and that it should "enter such orders with respect to all three ports

as the Commission may find to be required by their interrelationship." I. C. C. v. Baltimore & O. R. Co., 1957, 355 U.S. 175, 178, 78 S.Ct. 189, 190, 191, 2 L.Ed.2d 183.

In the opinion of the Commission under review in the instant case, the Commission has clearly stated its understanding of its duties on remand, as follows (314 I.C.C. at 152):

" * * * As a result of the court proceedings, we were directed to reconsider the following matters: (1) the relative cost of ocean transportation of iron ore from foreign origins to Baltimore and Philadelphia; (2) to what extent, if any, differences in ocean distances influence the movement of iron ore; (3) the ownership of vessels in which iron ore is carried; (4) the relative volume of traffic to Baltimore and Philadelphia with or without parity, and whether or not such ore shipments would seek the port offering the lowest transportation cost; (5) the New York schedules with respect to their effect on the Baltimore-Philadelphia rate situation; and (6) the importance of the national defense, as distinguished from other rate-making factors, as justification for rate parity."

On remand, after hearing, the Commission in its Findings and Conclusions [7] said (314 I.C.C. 168–169):

"1. In I, and S.No. 6074, we find that a just, reasonable, and nonprejudicial adjustment requires a parity of rates on import iron ore from Philadelphia and Baltimore to points in the Wheeling, Youngstown, and Steubenville steel-producing areas. We further find that the reduced rates in schedules of February

---

5. The court affirmed parity from Baltimore and Philadelphia to Pittsburgh.

6. Unfortunately, the case before the Commission has twice been closed just at the time that significant changes were occurring. In the first instance, the record was closed a few months after Labrador ore became available; in the second, a

few months after the opening of the St. Lawrence Seaway.

7. It is not necessary to set out at length herein the underlying facts found by the Commission, such as equality of ocean rates, other than from Labrador, to Baltimore and Philadelphia.

9, 1953, here under investigation, as subsequently increased pursuant to authorized general increases, from Philadelphia on the same level as from Baltimore, are just and reasonable.

"2. We further find, in the same proceeding, that a rate on import iron ore from New York to the Youngstown area the same as that from Baltimore or Philadelphia to the same area would unduly prefer New York and unduly prejudice Baltimore and Philadelphia. We further find that the proposed rate from New York is not shown to be just and reasonable. Our prior findings with respect to this rate is [sic] reversed.

\* \* \* \* \* \*

"4. We further find, in the same proceeding as now expanded to include Baltimore, that the proposed reduced rate from Baltimore below the level in effect from Philadelphia to the Youngstown area is not shown to be just and reasonable, and that continued maintenance of parity from Philadelphia and Baltimore at the present rate of $3.92 is just, reasonable, and otherwise lawful."

The plaintiffs promptly filed the instant case with respect to Findings and Conclusions 1 and 4. They intervened in proceedings brought in the United States District Court for the Southern District of New York which attacked Finding and Conclusion 2 above, and unsuccessfully sought to have those proceedings removed to this District and consolidated with this case. New York Central Railway Company v. United States, D.C.S.D.N.Y.1961, 200 F.Supp. 944. On June 27, 1962, the three-judge District Court for the Southern District of New York filed an opinion and order remanding to the Commission for a direct answer to the question what is the lawful rate structure on imported iron ore among the three ports, and why the Commission so decides. As to what additional evidence would be required, the Court said (New York Central Rail-

road Co. v. United States, D.C.S.D.N.Y. 1962, 207 F.Supp. 483, 498):

"\* \* \* While in no way would we circumscribe the Commission, the added evidentiary material needed appears rather limited—an updating of the cost studies of the New York carriers giving effect to the Commission's adjustments; similar cost studies for the Baltimore and Philadelphia carriers; comparisons of the yields of other similar traffic; current data as to ocean freight rates and costs on iron ore shipped to the various ports; national defense testimony, if anyone can produce really significant evidence on this subject; and recent information, giving effect to the opening of the St. Lawrence Seaway, as to the volume of import iron ore moving through Baltimore and Phildelphia, divided both as between points of origin and as between points of destination and, in the latter case, among the 9 points in differential territory where competition with New York would occur and the 8 where it would not. The case would appear appropriate for dispensing with a recommended decision, under § 8(a) (2) of the Administrative Procedure Act, 5 U.S.C.A. § 1007(a) (2). What is required most of all is a clear statement as to what the Commission does and does not regard as a lawful rate structure, and a reasoned explanation why, if it adheres to the result of the report here under review, it has reached a different conclusion than its previous one."

Thereafter the Commission by its order of August 7, 1962, reopened No. 6074 for further hearing and reconsideration. At a prehearing conference held September 11, 1962, the issues for further hearing were fixed as:

"The lawfulness (reasonableness *per se*) of the present rates from Baltimore and Philadelphia and the proposed rate from New York on import iron ore to each destination

named in the appendix hereto, and the lawfulness of the relation of said rates, one with another, are to be reconsidered after receipt of testimony thereon at the further hearing, under the terms of the Commission's order of August 7, 1962.

"Rates involved in the proceeding which have been canceled in compliance with earlier orders of the Commission are not in issue at this time."

A schedule of cost studies was set up, and in addition it was directed that:

"The parties will bring up to date rate and earnings comparisons which have been affected by changes in rates; provide all available information as to ocean freight rates and costs on iron ore transportation; and data will be furnished as to the movement of import iron ore to the 17 destinations mentioned, separately stated as to destination, point of origin, and port of entry into the United States. Particularly, information is to be provided as to the movement of import iron ore via the St. Lawrence Seaway and Great Lakes ports to the 17 destinations."

This Court is of course mindful of the well-recognized limitations upon the scope of review available when orders of the Interstate Commerce Commission are involved. Baltimore & Ohio Railroad Company v. United States, D.C.Md.1957, 151 F.Supp. 258, 273. However, in view of what are at best, latent ambiguities, and at worst, errors of law and conclusions unsupported by, or in conflict with, the undisputed evidence, we will remand this case for further proceedings before the Commission.[8] Since the United States District Court for the Southern District of New York has given directions with respect to certain aspects to be considered, and the Commission has indicated the nature, and the general scope, of the proposed further hearing, it will suffice to point out only the additional matters that we feel should also be considered.

■ 1. We are unable to determine from the Commission's opinion whether or not its conclusion with respect to parity between Baltimore and Philadelphia to the 17 points is based upon its assumed or expected division of only the ore moving from Baltimore and Philadelphia to the 17 points alone (or 15 of them), or upon its appraisal of the overall movement of iron ore from Baltimore and Philadelphia, of which ore going to the 17 points is an important part.

In stating the position of the parties, the Commission says that Philadelphia "seeks parity to obtain what it regards as a fair share of the iron ore traffic * * *" (314 I.C.C. at 151). In its statement of the matters to be reconsidered on the first remand, it lists "(4) the relative volume of traffic to Baltimore and Philadelphia with and without parity, and whether or not such ore shipments would seek the port offering the lowest transportation costs; * * * and (6) the importance of the national defense, as distinguished from other rate-making factors, as justification for rate parity." (314 I.C.C. at 152.) On the same page, after commenting on the vast increase after World War II of iron ore imported "through all ports" it states that "The issues in this proceeding, however, involve only the traffic through Philadelphia, Baltimore and New York."

All of these statements indicate that it is the overall picture that is to be considered. But even in the paragraph dealing with the national transportation policy, there are repeated references to ability to supply "a particular area"; to the ability of more than one port to insure a continuity of movement to "important interior consuming points." (314 I.C.C. at 161).

8. It is unnecessary to consider the question of whether, while an appeal was pending before this court, the Commission could, without petition to remand, motion to dismiss, or order of court, reopen this case.

In discussing the movement of ore *from* Sparrows Point (Baltimore) and Fairless (Pennsylvania) the Commission says:

> " * * * Shipments have moved from Sparrows Point and Fairless to destinations east and west of differential territory, but such traffic is not in issue in the proceeding." (314 I.C.C. at 153.)

The Commission then refers to its Table II showing the annual movement *"from the railroad piers* at each port * * *"* (314 I.C.C. at 153; emphasis supplied). Even this limited comparison of ore moving from the "railroad piers" of the respective "ports" receives no further mention by the Commission, and we are not told what, if any, significance is attached to Table II.

The emphasis of the Commission for basis of alleged comparison between Baltimore and Philadelphia, is upon the amounts of ore moving from Baltimore and Philadelphia to *15* of the 17 points. This is further shown by the rejection (to be discussed below in more detail) of the contention of the plaintiffs that substantial amounts passing through Baltimore to the 17 points do so because they are part of "split cargoes", the balance of which goes to points west of the 17 points, where the differential in favor of Baltimore over Philadelphia is much greater than 20 cents.

The Commission then states that steel companies operating plants in the 17 point area have stated that if the rail rate from Baltimore "is re-established differentially lower than from Philadelphia," they will route all vessels to Baltimore except in emergency situations. The Commission then concludes:

> "It thus appears that differentials in favor of Baltimore would result in a situation similar to that prevailing prior to 1954, when (as shown by Table II) practically all of this im-

port ore was discharged at Baltimore." 314 I.C.C. at 159.[9]

It thus appears that the Commission, instead of considering port competition as a whole, has restricted its concern solely to the 17 (or 15) point movements. This is the clear understanding of the defendants, who both in their briefs and argument seek to defend it.

Of course the specific question for decision by the Commission was parity *vel non* between Baltimore and Philadelphia to the 17 points. But the correct answer can be given only if the total ore shipments, to all points, which would include shipments to the 17 points, are considered. Philadelphia has, and as far as these proceedings are concerned will continue to have, parity with Baltimore to Pittsburgh. The movement of ore from Philadelphia to Pittsburgh and points east far exceeds that from Baltimore. For reasons to be mentioned shortly, it is at least doubtful if Baltimore can retain its present large proportion of the shipments west of the 17 points.

When the case was first decided, the Commission justified the elimination of the differential on the ground that it was necessary in order that Philadelphia as a port could obtain enough ore to support its new facilities, and survive. The general transportation policy and national defense were stated to require the existence of both Philadelphia and Baltimore as ports. The position of the Commission was so understood by this Court. 151 F.Supp. at 272–273; 274; 276; 278. But the ability to survive, of Baltimore as well as of Philadelphia, is dependent upon total tonnage. The Commission has made no adequate findings as to the probable *total* tonnage that will pass through Baltimore and Philadelphia with and without parity.

2. Even in its treatment of the iron ore destined for the 17 points,

---

9. The Commission here seems to adopt the ellipsis so frequently employed by the defendants of referring to the condition pre-1954 as "pre-parity" in Philadelphia. It was; but it was also "pre" modern large unloading facilities.

the Commission has apparently not proceeded on the theory of port versus port. Its approach seems to be railroad against railroad.

The Commission apparently adopted the contention of the Pennsylvania Railroad that as neither the Baltimore and Ohio nor the Western Maryland has direct or joint-line service from Baltimore to Weirton and Midland, two of the 17 points, while the Pennsylvania Railroad has direct service from both Philadelphia and Baltimore to those points, the tonnage moving to Weirton and Midland should be deducted from the total tonnage moving to the 17-point area on the ground that it is not competitive.[10] The Commission then refers to its Table III, showing movements from both ports to the other 15 destinations. (314 I.C.C. at 155). It then adjusts these figures to reduce the Baltimore tonnage and increase the Philadelphia tonnage to reflect tonnage directed to Baltimore in 1954 and 1958 because of strikes and maritime necessity. Having made these adjustments to a 15-point table, the Commission then makes the remarkable statement that:

> "With those adjustments, the greater volume to the *17* point area moved from Baltimore in 1955, 1956, 1957 and during four months of 1959." (314 I.C.C. at 156; emphasis supplied.)

The glaring fallacy of this approach [11] is that a substantial amount of imported iron ore *does in fact* go to Weirton and Midland from Baltimore—over the five-year period 1954–1958 some 1,450,000 tons. While this may be small compared to the some 5,500,000 tons from Philadelphia, it is a significant portion of Baltimore's total.

Certainly Baltimore and Philadelphia are in competition for ore to Midland and Weirton. Baltimore as a port is interested in the receipt and shipment of iron ore, whether it moves via the Pennsylvania or any other railroad.

Moreover, in considering the total iron ore probably available to the two ports, the elimination of iron ore to Weirton and Midland, although it actually passed through the ports of Baltimore and Philadelphia, results in a serious distortion in favor of Philadelphia. Philadelphia's apparent overall totals are reduced by some 5,500,000 tons; Baltimore's by approximately 1,450,000.[12]

We see no justification for the elimination of the Weirton and Midland tonnages, either in considering the shares of Baltimore and Philadelphia in traffic to the 17 points, or in a port versus port comparison.

■ 3. The Baltimore interests contended that even the apparent share of Baltimore in movements to the 17 points is distorted to the extent that "split cargoes" enter into it. The contention and its rejection are succinctly stated by the Commission (314 I.C.C. at 156):

> "* * * Certain vessels discharging at Baltimore each year since 1953 carried so-called split cargoes of ore, some of which was destined to the 17-point area and the remainder to points west thereof. The Baltimore interests contend that those vessels were routed to Baltimore because of lower rates to destinations west of the differential area, and were not influenced by the rate situation to the 17 points in issue. Therefore, they urge that such iron ore to the latter area, which reached Baltimore because of lower rates on the remainder of the split cargo, should not be included in the above tables. There is, how-

---

10. If in fact tonnage to Weirton and Midland is not competitive, there is no reason to impose parity.

11. The treatment of the subject by the Commission practically requires this conclusion. The briefs of the defendants proceed on that theory; e. g. Pennsylvania Railroad, page 42; City of Philadelphia, page 19; United States, page 7; Delaware River Port Authority, page 6; Armco, et al., page 10.

12. Table III, and Stipulated Exhibit 317, pages 7 and 9.

ever, no evidence that such lower rates actually influenced the routing of the vessels to Baltimore."

Rates from Baltimore to points west of the 17 points are lower than the quoted rates from Philadelphia by $0.82 to $2.65 a ton. If a ship carries ore for one of the 17 points, and ore for a point west thereof, it is obvious that the ship will unload at Baltimore to avoid the prohibitive differential on the part of the cargo consigned west of the 17 points. In the years 1954–1958 some 1,600,000 tons which went through Baltimore to the 17 points represented part of such split cargoes.

When the whole theory of defendants' case, apparently adopted by the Commission (314 I.C.C. 159) is that a 20 cent differential to the 17 points in favor of Baltimore would result in the discharge in Baltimore of "practically all" of the import ore destined for the 17 points (314 I.C.C. at 159), the Court is at a complete loss to understand how the Commission can say that there is "no evidence" that a differential of 82 cents to $2.65 "actually influenced the routing of vessels to Baltimore."

■ 4. Apparently because of the limitation of its inquiry as to the sharing between Baltimore and Philadelphia of ore to that destined for the 17 points, the Commission has failed even to mention a further contention of the Baltimore interests with respect to the total amount of ore upon which Baltimore can rely.

As previously mentioned, the filed tariffs for points west of the 17 points show a differential in favor of Baltimore far in excess of 20 cents a ton. As a result, during the five year period 1954–1958, 3,742,803 tons have moved from Baltimore to these points west of the 17 points (a very substantial portion of Baltimore's total) and only 55,278 tons

have moved from Philadelphia to these points farther west.

Why the rates from Philadelphia have not been reduced to a parity, or at least to 20 cents above the Baltimore rates, has never openly been explained. Perhaps the reason is that if that had been done, there would have been pragmatic evidence of the effect upon Baltimore shipments to the west of the 17 points, and with respect to shipments from Baltimore to the 17 points from what are now (but would not then have the effect of) "split cargoes."

Even speculatively, it would seem unreasonable to assume that Baltimore will in the future be permitted to retain 98½% of the iron ore traffic west of the 17 points. On the record it is clear that if Philadelphia wins this case, the Pennsylvania Railroad intends to file parity rates from Philadelphia to some of these western points, with perhaps even lower rates to others.[13] Under parity, the Pennsylvania Railroad would prefer to get this iron ore tonnage at Philadelphia rather than at Baltimore, as it would be better off from a financial standpoint.[14]

Of course this Court does not undertake to forecast what the future of the movement of this ore will be as between Philadelphia and Baltimore, but the matter is certainly one for consideration and a finding by the Commission on remand.

The case is remanded to the Commission for further proceedings in accordance with this opinion. The cost studies should also include evidence as to unloading costs and terminal costs in Philadelphia paid or properly chargeable to iron ore discharged there for inland shipment via the Pennsylvania Railroad to permit a comparison with the 63 cents a ton paid by the Pennsylvania Railroad for services in Baltimore.

13. Transcript before Commission, 2216–2222.

14. Transcript before Commission, 2220–2222. The Pennsylvania Railroad pays 63 cents per ton for the use of unloading and terminal facilities at Baltimore.

Plaintiffs' request that the Philadelphia parity rates be permanently enjoined must be denied at this time. Despite certain equities in favor of plaintiffs' further request that the Philadelphia parity rates be enjoined pendente lite, we have concluded that such an injunction should not now be issued.